**United States District Court**
**Southern District of New York**

_____

AIG GLOBAL SECURITIES LENDING CORP.,
et al.,                                                    01 Civ. 11448 (JGK)

                              Plaintiffs,

          - against -

BANC OF AMERICA SECURITIES, LLC, and
FIRST UNION SECURITIES, INC.,

                              Defendants.

_____

**JOHN G. KOELTL, District Judge:**

This is an action charging securities fraud that was the
subject of a prior Opinion by this Court in which the Court
dismissed without prejudice the original complaint.  See AIG
Global Securities Lending Corp. v. Banc of America Securities
LLC, 254 F. Supp. 2d 373 (S.D.N.Y. 2003).  The plaintiffs
purchased securities in two private offerings of asset-backed
securities.  The securities were backed by consumer installment
contracts entered into by The Heilig-Meyers Furniture Company
("Heilig-Meyers"), a specialty retailer of home furnishings that
earned substantial revenues by selling furniture through fixed-
term, fixed-payment installment sales contracts.  After Heilig-
Meyers declared bankruptcy, the plaintiffs in this action sued
the two firms from which they purchased the securities and
alleged, among other things, securities fraud.  One of these

1

firms, Banc of America Securities, LLC ("Banc of America"), now moves to dismiss the Amended Complaint as the remaining defendant.[1]

The plaintiffs are AIG Global Securities Lending Corporation ("AIG"), AIG Life Insurance Company ("AIG Life"); Allstate Life Insurance Company ("Allstate Life"); Banc Leumi USA ("Banc Leumi"); Bayerische LandesBank, New York Branch ("Bayerische LandesBank"); First Floridian Automobile and Home Insurance Company ("First Floridian"); First Trenton Indemnity Company ("First Trenton"); International Finance Company ("IFC"); The Premier Insurance Company of Massachusetts ("Premier"); SAFECO Life Insurance Company ("SAFECO Life"); Société Generale; The Travelers Indemnity Company ("Travelers Indemnity"); and The Travelers Insurance Company ("Travelers Insurance"), (collectively the "plaintiffs").[2] The plaintiffs have alleged claims under both the federal securities laws and the New York State common law, arising out of the allegedly false and misleading statements and omissions made in Offering Memoranda and other documents that were used to promote, market,

---

[1] The plaintiffs entered into a settlement agreement with First Union Securities, Inc. ("First Union") and the Court signed a Bar Order dated January 28, 2005 pursuant to the agreement reached by the parties.

[2] Pursuant to a settlement agreement reached with Banc of America, Halifax plc is no longer a plaintiff in this action. (See letter from Warren H. Colodner to the Court dated June 24, 2005.)

and sell the securities to the plaintiffs. The plaintiffs assert four causes of action: (1) violations of Section 10b of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (Count 1); (2) violations of Section 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77l(a)(2) (Count 2); (3) common law fraud and deceit (Count 3); and (4) negligent misrepresentation (Count 4).

Banc of America now moves to dismiss the Amended Complaint pursuant to Federal Rule Civil Procedure 12(b)(6) and Federal Rule of Civil Procedure 9(b), arguing that the plaintiffs have failed to plead fraud with particularity as required by Rule 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b), ("PSLRA"), and that the plaintiffs have failed to establish loss causation with respect to Counts One and Two of the Amended Complaint. In addition, Banc of America argues that the Amended Complaint fails to establish the "strong inference" of scienter required under the PSLRA and that the plaintiffs have failed to allege reasonable reliance with particularity. Alternatively, the defendant moves to dismiss Counts One and Two, pursuant to Section 9(e) of the Exchange Act, 15 U.S.C. § 78i(e), with respect to Count One, and Section 13 of the Securities Act, 15 U.S.C. § 77m, with respect to Count

Two, on the grounds that the plaintiffs' claims are barred by the applicable statute of limitations. With respect to Count Three, Banc of America argues that the plaintiffs fail to state a common law fraud and deceit claim under New York law. Finally, with respect to Count Four, the defendant argues that the Martin Act preempts the plaintiffs' claim for negligent misrepresentation and that the plaintiffs have failed to plead the "special relationship" required to establish a claim for negligent representation.

## I.

On a motion to dismiss, the allegations in the complaint are accepted as true. See Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). In deciding a motion to dismiss, all reasonable inferences are drawn in a plaintiff's favor. See Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, the defendant's motion to dismiss should only be granted if it appears that the plaintiffs can prove no set of facts in support of their claim that would entitle them to

relief.  See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 514

(2002); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Grandon,

147 F.3d at 188; Goldman, 754 F.2d at 1065.

In deciding the motion, the Court may consider documents

that are referenced in the complaint, documents that the

plaintiffs relied on in bringing suit and that are either in the

plaintiffs' possession or the plaintiffs knew of when bringing

suit, or matters of which judicial notice may be taken.

Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002);

see also Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d

Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d

42, 47-48 (2d Cir. 1991); VTech Holdings Ltd. v. Lucent Techs.,

Inc., 172 F. Supp. 2d 435, 437 (S.D.N.Y. 2001).  "[W]hen a

plaintiff chooses not to attach to the complaint or incorporate

by reference a document upon which it relies and which is

integral to the complaint, the court may nonetheless take the

document into consideration in deciding the defendant[s'] motion

to dismiss, without converting the proceeding to one for summary

judgment."  Int'l Audiotext Network, Inc. v. AT&T Co., 62 F.3d

69, 72 (2d Cir. 1995) (internal citation and quotation marks

omitted); see In re Loral Space & Communications Ltd. Secs.

Litig., No. 01 Civ. 4388, 2004 WL 376442, at *2 (S.D.N.Y. Feb.

27, 2004); Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp.

209, 215 (S.D.N.Y. 1997). Accordingly, the facts alleged in the Amended Complaint are accepted as true for the purposes of this motion. Although familiarity with the prior decision is assumed, the facts and procedural history are presented to the extent necessary to decide the current motion.

Heilig-Meyers, one of the nation's largest publicly held specialty retailers of home furnishings, has its corporate headquarters in Richmond, Virginia. (Amend. Compl. ¶ 27.) As of June 30, 1998, Heilig-Meyers operated approximately 1,295 retail stores in 38 states, the District of Columbia, and Puerto Rico. (Id.) Two years later, as of June 30, 2000, prior to its Chapter 11 Bankruptcy filing, it operated 873 stores in 29 states, the District of Columbia, and Puerto Rico. (Id.) An important part of Heilig-Meyers' operating strategy depended on the use of installment sales, whereby it offered extended payment terms on most merchandise purchased under fixed-term, fixed-payment installment sales contracts (the "Contracts"). (Amend. Compl. ¶ 28.) These Contracts provided for the payment by the obligor of finance charges plus a specific total amount of payments equal to the amount financed, and those amounts were payable in substantially equal monthly installments. (Id.) The merchandise purchased from the store secured each Contract. (Id.) The Contracts constituted a substantial portion of

6

Heilig-Meyers' sales. (Id.) As of December 31, 1997, the aggregate amount owed under the Contracts was $957,741,000, of which $876,148,000 was from principal, while $81,593,000 was from unearned finance charges. (Amend. Compl. ¶ 30.)

In February 1997, the Heilig-Meyers Master Trust (the "Trust") was formed in order to hold a substantial number of the installment sales Contracts and also in order to issue multiple series of asset-backed securities. (Amend. Compl. ¶ 29.) The Contracts that the Trust held originated and were held at various Heilig-Meyers retail stores. (Amend. Compl. ¶ 30.) The Trust was formed pursuant to a Master Pooling and Servicing Agreement, dated February 26, 1997, and named the MacSaver Funding Corporation as transferor, Heilig-Meyers as servicer, and First Union National Bank, an affiliate of the former defendant First Union, as trustee. (Amend. Compl. ¶¶ 32, 36.) The transferor was responsible for transferring and assigning the Contracts to the Trust. (Amend. Compl. ¶ 34.) The servicer was responsible for all aspects of servicing and administering the Contracts, a task that included billing obligors, collecting payments due under the Contracts, and maintaining internal records and databases. (Amend. Compl. ¶ 35.) The trustee was responsible for preserving the Trust and its assets and monitoring the servicer. (Amend. Compl. ¶ 36.)

The Trust issued three series of asset-backed securities ("the Certificates") during 1997 and 1998. (Amend. Compl. ¶ 37.) Each Certificate represents an undivided interest in the Trust, and conferred on a Certificate holder the right to receive, as payments of interest and principal on the Certificate, a portion of the collections on the Contracts in accordance with the terms and conditions contained in the Pooling and Servicing Agreement and other documents. (Id.)

When the Trust issued Certificates, they were first purchased by First Union and Banc of America, and those companies served as underwriters, meaning they purchased the securities for the purpose of promoting, marketing, offering, and selling them to investors, including the plaintiffs. (Amend. Compl. ¶ 1.) The basis of this lawsuit is the alleged fraud committed by Banc of America in its role as one of the underwriters of the Heilig-Meyers asset-backed securities.[3] (Id.)

In February 1997, the Trust issued a series of certificates called the Variable Funding Certificates, Series 1997-1 ("Series 1997-1 Certificates") in an aggregate original principal amount

---

[3]  The Amended Complaint refers to First Union and Banc of America, collectively, as the "defendant underwriters."  Because First Union is no longer a defendant in this action, the allegations directed jointly against First Union and Banc of America are now considered solely against Banc of America.

of $592 million.  (Amend. Compl. ¶ 38.)  Together, First Union
and Banc of America purchased $428 million principal amount of
the 1997-1 Certificates.  (Id.)  At the time of the Trust's two
subsequent offerings, which took place in 1998, Banc of America
and First Union continued to hold the Series 1997-1
Certificates, and with the proceeds that they eventually
received from the 1998 offerings, First Union and Banc of
America were repaid a substantial portion of the principal they
had invested in purchasing the Series 1997-1 Certificates.
(Id.)  In February 1998 the Trust issued another series of
certificates ("Series 1998-1 Certificates") that were divided
into several classes of interests, including (1) Class A 6.125%
Asset Backed Certificates, in the aggregate original principal
amount of $307 million; and (2) Class B 6.35% Asset Backed
Certificates, in the aggregate principal amount of $61 million.
(Amend. Compl. ¶ 39.)  First Union and Banc of America purchased
all of the 1998-1 Class A and Class B Certificates and resold
those Certificates to qualified institutional investors,
including the plaintiffs, as part of the 1998-1 Offering ("1998-
1 Offering") which began on February 20, 1998.  (Amend. Compl. ¶
40.)

Banc of America served as one of the underwriters of the
1998-1 Offering, which sold the Class A and Class B 1998-1

Certificates.  In connection with that offering, Banc of America drafted a formal Offering Memorandum (the "1998-1 Offering Memorandum").  (Amend. Compl. ¶ 42.)  In addition, Banc of America prepared sales memoranda containing information about the Offering, the Certificates, the Trust, the Pooling and Servicing Agreement, Heilig-Meyers, and the Contracts.  (Amend. Compl. ¶ 43.)  This information, together with information disclosed in telephone conferences, was provided to the plaintiffs in connection with the 1998-1 Offering.  (Id.)

In August 1998, the Trust issued another series of certificates ("Series 1998-2 Certificates") that were also divided into several classes of interests, including (1) Class A Floating Rate Asset Backed Certificates, in the aggregate original principal amount of $230 million; and (2) Class B Floating Rate Asset Backed Certificates, in the aggregate original principal amount of $50 million.  (Amend. Compl. ¶ 45.) As with the 1998-1 Offering, First Union and Banc of America purchased all of the Class A and Class B Series 1998-2 Certificates and resold them to qualified institutional investors, including the plaintiffs, as part of the 1998-2 Offering ("1998-2 Offering"), which began on August 20, 1998. (Amend. Compl. ¶ 46.)

Banc of America served as one of the underwriters of the 1998-1 Offering, which sold the Class A and Class B 1998-1 Certificates.  In connection with the 1998-2 Offering, Banc of America drafted a formal Offering Memorandum (the "1998-2 Offering Memorandum").  (Amend. Compl. ¶ 48.)  In addition, Banc of America prepared sales memoranda containing information about the Offering, the Certificates, the Trust, the Pooling and Servicing Agreement, Heilig-Meyers, and the Contracts.  (Amend. Compl. ¶ 49.)  This information, together with information disclosed in telephone conversations, was provided to the plaintiffs in connection with the 1998-2 Offering.  (Id.)

The various plaintiffs purchased Certificates from Banc of America in connection with one or both of the 1998-1 and 1998-2 Offerings.  (Amend. Compl. ¶¶ 51-65.)

On or about August 10, 2000, Heilig-Meyers informed the trustee that Heilig-Meyers intended to stop performing its role as servicer during the week of August 14, 2000.  (Amend. Compl. ¶ 66.)  On August 14, 2000, First Union Bank, as the trustee, successfully enjoined, for a period of three days, Heilig-Meyers from abdicating its role as servicer.  (Id.)

On August 16, 2000, Heilig-Meyers filed a petition for Bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District

of Virginia.  (Amend. Compl. ¶ 67.)  At that time, Heilig-Meyers filed a motion in the Bankruptcy Court for authority to abandon its obligations as servicer and to reject the Master Pooling and Servicing Agreement.  (Id.)  Heilig-Meyers also announced its intention to close several hundred retail stores, including stores through which it collected payments on the Contracts. (Id.)

On August 16, 2000, First Union Bank filed a complaint in the Bankruptcy Court in order to prevent Heilig-Meyers from repudiating its servicing duties or from terminating the employment of personnel responsible for servicing and collections.  (Amend. Compl. ¶ 68.)  In this filing, First Union Bank indicated that making collections on the Contracts was difficult, allegedly due, in part, to the decentralized collection system then in place.  (Id.)  Data associated with making collections was allegedly stored in a format only familiar to Heilig-Meyers employees.  The employees of any replacement servicer would not be able to use immediately the data, which required the cooperation of Heilig-Meyers and its employees to effect a successful transition.  (Id.)  Heilig-Meyers and First Union Bank temporarily agreed upon the continuation of Heilig-Meyers' servicing operations, but ultimately no satisfactory transfer of servicing was effected.

According to the plaintiffs, this transfer of servicing failed, in part, because of the lack of a centralized billing system and a centralized database regarding Contract obligors. (Amend. Compl. ¶ 70.)

Collection rates on the Contracts allegedly deteriorated after Heilig-Meyers ended servicing and have not recovered. The holders of all of the Certificates have allegedly suffered significant shortfalls in promised interest payments. (Amend. Compl. ¶¶ 72-73.) The current principal balance of the Certificates held by the plaintiffs is approximately $140 million, consisting of approximately $25.4 million of the 1998-1 Class A Certificates, $46.6 million of the 1998-2 Class A Certificates, and $68.5 million of the 1998-1 and 1998-2 Class B Certificates.[4] (Amend. Compl. ¶ 74.)

The plaintiffs allege four sets of misrepresentations and omissions made by Banc of America relating to the practices of Heilig-Meyers and the nature of the securities being sold in the 1998 Offerings.

First, the plaintiffs allege that Banc of America failed to disclose the lack of a centralized billing system and database regarding Contract obligors, and that Banc of America made

---

[4] These amounts would be substantially reduced because of the settlement by Halifax plc, which had originally purchased in excess of $50 million of 1998 Certificates. (Amend. Compl. ¶ 59.)

allegedly misleading statements that suggested centralized aspects of the Heilig-Meyers billing practices and systems. (Amend. Compl. ¶¶ 79-85.) Banc of America also allegedly failed to disclose the fact that, at the request of various rating agencies, a special Backup Servicing Agreement, between First Union Bank as trustee and Heilig-Meyers as servicer and transferor, was put in place at the time of the 1998-1 Offering. (Amend. Compl. ¶ 86.) The Backup Servicing Agreement was purportedly created to anticipate the situation where Heilig-Meyers was unable to continue, or removed as servicer, and the Agreement imposed certain obligations upon the trustee and servicer. (Amend. Compl. ¶ 87.) Specifically, the plaintiffs allege that under the Backup Servicing Agreement, Heilig-Meyers was obligated to provide, on a monthly basis, computer tapes, records, and any other material that would allow the trustee to maintain current information on the Contracts in order to facilitate a rapid transition to a successor servicer, if necessary. The trustee agreed to review the data promptly. (Amend. Compl. ¶ 88.) The Agreement was allegedly not disclosed to the plaintiffs until the eve of the Heilig-Meyers bankruptcy in August 2000. (Amend. Compl. ¶ 89.)

Second, Banc of America allegedly represented that the Contracts had a favorable record of historical losses and

delinquency rates that were comparable to the rates of other large retailers. (Amend. Compl. ¶ 92.) Banc of America allegedly failed to acknowledge that Heilig-Meyers' rates were artificially buoyed by certain non-standard practices and the use of a liberal non-mainstream accounting method known as "recency" accounting. (Amend. Compl. ¶ 93.) Banc of America allegedly knew that the Heilig-Meyers loss and delinquency rates were quoted based on the recency accounting method, and failed to disclose that these rates were being compared against other retailers who used a traditional "contractual" method of accounting. (Amend. Compl. ¶ 101.) According to the plaintiffs, the contractual method would have yielded unfavorable loss and delinquency rates for Heilig-Meyers when compared against other retailers using the contractual method of accounting. (Amend. Compl. ¶¶ 101-04.) The plaintiffs allege that loss and delinquency rates calculated using the contractual method would have been about twice as large as the rates reported based on the recency method of accounting used by Banc of America in representations to the plaintiffs. (Amend. Compl. ¶ 103.) Consequently, the plaintiffs allege that specific sales memoranda sent to the plaintiffs prior to the 1998-1 and 1998-2 Offerings drew false and misleading comparisons between the loss experience numbers for the Contracts and the loss experience

numbers for other well-known retailers in connection with Heilig-Meyers' recent receivable securitizations. (Amend. Compl. ¶¶ 93-100.) These misrepresentations were allegedly included in sales memoranda sent during February 1998 by Banc of America to Bank Leumi, Bayerische Landesbank, and Citigroup Investments, which recited the following loss rates for calendar year 1997:

> Heilig-Meyers – 7.10%; JC Penney [ – ] 7.15%; Dayton Hudson – 7.65%; Sears – 7.84%; Charming Shoppes – 9.76%; Limited – 9.92%; Federated – 10.36%; Spiegel 11.82%; Bridgestone – 12.78%; and Fingerhut – 21.02%.

(Amend. Compl. ¶ 96.)

Moreover, the Amended Complaint alleges that Heilig-Meyers allegedly maintained two sets of books relating to losses and delinquencies, including one set of records that employed recency accounting and deemed "current" many obligors who were past due on one or more payments, or who should have been treated as "charged off" under the terms in the Offering Memoranda. (Amend. Compl. ¶ 93.) The other set of records, which were allegedly disclosed to Banc of America but not to the plaintiffs or other investors, employed the contractual method of accounting and, according to the plaintiffs, accurately reflected the obligors who owed one or more past due payments as well as those who should have been treated as "charged off."

16

(Id.)  The plaintiffs allege that various sales memoranda sent
by Banc of America misrepresented the status of these obligors
by suggesting that Heilig-Meyers used the contractual method of
accounting when in fact the recency method was used.  For
example, a sales memorandum sent to Citigroup Investments dated
February 13, 1998 allegedly stated that Heilig-Meyers "Losses
are very conservatively recognized; earlier of 180 days
delinquent, bankruptcy or repossession."  (Amend. Compl. ¶ 97.)
Similarly, sales memoranda sent to Bayerische Landesbank on
February 17, 1998 and Bank Leumi on February 20, 1998 allegedly
stated that Heilig-Meyers had "Superior Credit Experience – Loss
Rates substantially lower than most retail," and "Conservative
Accounting treatment: All contracts > 180 days delinquent,
repossessions & bankruptcies charged off."  (Id.)

     Third, the plaintiffs allege that Banc of America
materially overstated the aggregate principal balances due under
the Contracts, while simultaneously materially understating the
amount of unearned finance charges.  (See Amend. Compl. ¶¶ 108-
16.)  The plaintiffs specifically allege that the Contract
balance in September 2000 was overstated by $30 million and the
aggregate unearned finance charges were understated by
approximately $58 million:

     According to an April 2001 report prepared by OSI, a
     successor servicer, the aggregate principal balance as of

the end of September 2000 as reported by Heilig-Meyers was
approximately $953 million, whereas the aggregate principal
balance of the end of September 2000 as calculated by OSI
was approximately $923 million, or about $30 million lower.
According to the same report, the aggregate unearned
finance charges as of the end of September 2000 as reported
by Heilig-Meyers was approximately $70 million, whereas the
aggregate unearned finance charges as of the end of
September 2000 as calculated by OSI was approximately $128
million, or about $58 million higher.

(Amend. Compl. ¶ 113.)

The plaintiffs contend that accuracy in reporting these Contract

balances, particularly the aggregate principal balance, was

important because such figures provided the plaintiffs with a

foundation by which they could evaluate their investments.

(Amend. Compl. ¶ 114.)

Fourth, according to the plaintiffs, Banc of America failed

to disclose adequately its financial self-interest in both the

1998-1 and 1998-2 Offerings, namely, that the proceeds of these

offerings would be used to repay Banc of America's investment in

the Series 1997-1 Certificates. (See Amend. Compl. ¶¶ 117-27.)

The plaintiffs allege that if the plaintiffs had known that Banc

of America planned to receive a substantial amount of the

proceeds of the 1998 Offerings to repay its investments in the

1997-1 Series, the plaintiffs would have, at a minimum,

questioned the factual representations made by the defendant

related to the quality of the receivables in the Trust and

Heilig-Meyers' servicing systems and practices. (Amend. Compl.

¶ 124.)  The plaintiffs allege that Banc of America and First Union received well over half of the combined proceeds of the 1998-1 and 1998-2 Offerings.  (Amend. Compl. ¶ 125.)

## II.

Banc of America moves pursuant to Rule 12(b)(6) to dismiss the plaintiffs' § 10(b) and Rule 10b-5 claim on the grounds that, among other things, the plaintiffs have not adequately pleaded facts giving rise to the required state of mind. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
> . . . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Similarly, Rule 10b-5, promulgated under § 10(b) and codified at 17 C.F.R. § 240.10b-5, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make

19

> the statements made, in the light of the circumstances
> under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business
> which operates or would operate as a fraud or deceit upon
> any person, in connection with the purchase or sale of any
> security.

In order to state a claim brought pursuant to Section 10b and
Rule 10b-5, a plaintiff must sufficiently allege that "in
connection with the purchase or sale of securities, the
defendant, acting with scienter, made a false material
representation or omitted to disclose material information and
that the plaintiff's reliance on defendant's action caused
[plaintiff] injury." Rothman v. Gregor, 220 F.3d 81, 89 (2d
Cir. 2000) (alteration in original) (citing Chill v. Gen. Elec.
Co., 101 F.3d 263, 266 (2d Cir. 1996)); see also Kalnit v.
Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (citing San Leandro
Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,
75 F.3d 801, 808 (2d Cir. 1996)); In re Loral Space, 2004 WL
376442, at *5; Buxbaum v. Deutsche Bank, 196 F. Supp. 2d 367,
372 (S.D.N.Y. 2002).

In the context of securities fraud statutes, scienter
"means intent to deceive, manipulate, or defraud, or at least
knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d
1450, 1467 (2d Cir. 1996) (citations omitted); see also SEC v.
Todt, No. 98 Civ. 3980, 2000 WL 223836, at *9 (S.D.N.Y. Feb. 25,
2000) aff'd, 7 Fed. Appx. 98, 2001 WL 345151 (2d Cir. 2001).

Scienter may be inferred from proof of "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" or from proof that a defendant had "both motive and opportunity to commit fraud." Rothman, 220 F.3d at 90; see also Kalnit, 264 F.3d at 138; Chill, 101 F.3d at 267. An "egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." Novak v. Kazaks, 216 F.3d 300, 308 (2d Cir. 2000) (quotations omitted).

Allegations of securities fraud under Section 10(b) and Rule 10b-5 are subject to Federal Rule of Civil Procedure 9(b) and the PSLRA's requirements regarding scienter. See 15 U.S.C. § 78u-4(b)(2); Chill, 101 F.3d 263, 266 (2d Cir. 1996); Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127- 28 (2d Cir. 1994). Under the PSLRA, "plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, the intent to "deceive, manipulate, defraud, or knowing misconduct." Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 537-38 (2d Cir. 1999). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128, quoted by *Press*, 166 F.3d at 538; see also Marcus v. Frome, 329 F. Supp. 2d 464, 472 (S.D.N.Y. 2004); In re Loral Space, 2004 WL 376442, at *5.

The plaintiffs have adequately alleged facts to show scienter based on the defendant's motive and opportunity to commit fraud. The Court of Appeals for the Second Circuit has noted that opportunity "entail[s] the means and likely prospect of achieving concrete benefits by the means alleged." Novak, 216 F.3d at 307 (internal citation omitted). The parties do not appear to dispute the fact that Banc of America had an opportunity to commit fraud through the various representations Banc of America made in the Offering and sales memoranda and telephone calls -- all of which were allegedly designed to induce the plaintiffs to purchase the Certificates. See San Leandro, 75 F.3d at 813 (citing In re Time Warner Securities Litig., 9 F.3d 259, 269 (2d Cir. 1993)). The closer issue is whether the plaintiffs have adequately alleged that the defendant had a motive to commit fraud. The Court of Appeals has explained that allegations of motive are sufficient if they "entail concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged."

<u>Kalnit</u>, 264 F.3d at 139 (internal quotation marks omitted). The plaintiffs "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." <u>Id.</u> Motives generally possessed by most corporate directors and officers do not suffice. <u>Id.</u> Therefore, the Court of Appeals has concluded that motive is not adequately pleaded where the plaintiffs allege that the defendant had a desire for the corporation to appear profitable or a desire to keep stock prices high in order to increase officer compensation. <u>Id.</u>; <u>see also</u> <u>Novak</u>, 216 F.3d at 307-08 (collecting cases). By contrast, the Court of Appeals has held that motive is adequately pleaded where the plaintiffs allege that the defendant sold its own shares while at the same time misrepresenting corporate performance in order to inflate stock prices. <u>See</u> <u>Kalnit</u>, 264 F.3d at 139; <u>Novak</u>, 216 F.3d at 307-08 (collecting cases); <u>see also</u> <u>Marcus</u>, 329 F. Supp. 2d at 473; <u>In re Loral Space</u>, 2004 WL 376442, at *6.

The Amended Complaint alleges that, through its investments in the Heilig-Meyers Certificates, Banc of America received a concrete and personal benefit beyond the generic profit motive that could be imputed to any underwriter who is motivated to earn its underwriting fees. <u>See, e.g.</u>, <u>Fisher v. Offerman & Co., Inc.</u>, No. 95 Civ. 2566, 1996 WL 563141 (S.D.N.Y. Oct. 2, 1996), at *6-*7. The Amended Complaint specifically alleges

that Banc of America had invested in Heilig-Meyers and

substantially reduced its own risk exposure by inducing the

plaintiffs to purchase securities in Heilig-Meyers.  (Amend.

Compl. ¶¶ 124-27.)  This is sufficient to show that Banc of

America had a motive to commit the alleged fraud.  See Suez

Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87,

100 (2d Cir. 2001) ("We agree that three of the corporate

defendants . . . as creditors or equity holders in the company,

had a motive for fraud based upon their own at-risk

investments."); In re Independent Energy Holdings PLC Sec.

Litig., 154 F. Supp. 2d 741, 766 (S.D.N.Y. 2001); abrogated on

other grounds by In re Initial Public Offering Sec. Litig., 241

F. Supp. 2d 281 (S.D.N.Y. 2003).  Accordingly, the plaintiffs

have satisfied Section 10(b)'s scienter requirement.[5]

---

[5]  Although the plaintiffs have alleged scienter, Banc of America
argues that they have not alleged reasonable reliance on any
misrepresentations or omissions.  However, the issue of whether
an investor reasonably relied on a defendant's
misrepresentations is a fact-intensive inquiry that cannot be
decided on this motion to dismiss.  See Waltree Ltd. v. ING
Furman Selz LLC, 97 F. Supp. 2d 464, 469 (S.D.N.Y. 2000); DIMON
Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 372 (S.D.N.Y. 1999).
Banc of America's motion to dismiss based on a failure to allege
reasonable reliance is therefore denied.

## III.

Banc of America moves to dismiss the Amended Complaint on the grounds that the plaintiffs have not established either the materiality of the alleged misrepresentations and omissions, or loss causation with respect to each of the four sets of alleged misrepresentations or omissions. Accordingly, the issues of materiality and loss causation will be considered together with respect to each set of allegations.

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed R. Civ. P. 9(b); see Four Finger Art Factory v. Dinicola, No. 99 Civ. 1259, 2001 WL 21248, at *5 (S.D.N.Y. Jan. 9, 2001). To meet the requirements of Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). The PSLRA also requires that allegations of securities fraud based on misrepresentations or omissions of material facts be made with particularity. The PSLRA provides, in relevant part,

25

> the complaint shall specify each statement alleged to have
> been misleading, the reason or reasons why the statement is
> misleading, and, if an allegation regarding the statement
> or omission is made on information and belief, the
> complaint shall state with particularity all facts on which
> that belief is formed.

15 U.S.C. § 78u-4(b)(1).

A complaint alleging violations of § 10(b) and Rule 10b-5 must, therefore, also satisfy the PSLRA's pleading requirements. <u>See</u> <u>Novak</u>, 216 F.3d at 306-07; <u>see also</u> <u>AIG</u>, 254 F. Supp. 2d at 382-83.

In addition to these materiality requirements under Rule 9(b) and the PSLRA, a securities fraud plaintiff must plead a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered. <u>See</u> <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Group</u>, 343 F.3d 189, 198-99 (2d Cir. 2003). To plead causation sufficiently under Section 10(b) "a plaintiff must allege both transaction causation, <u>i.e.</u>[,] that <u>but</u> <u>for</u> the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, <u>i.e.</u>, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." <u>In re Parmalat Sec. Litig.</u>, No. 04 MD 1653, 2005 WL 1527674, at *15 (S.D.N.Y. June 28, 2005) (footnote omitted); <u>see</u> <u>Dura Pharmaceuticals, Inc v. Broudo</u>, 125 S. Ct. 1627, 1633 (2005) ("[The PSLRA] . . . makes clear Congress'

intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.")

According to Banc of America, the plaintiffs fail to allege loss causation. Loss causation is adequately pleaded by alleging that (1) the misrepresentation artificially inflated the value of the security, or otherwise misrepresented its investment quality, and (2) the subject of the misrepresentation caused the decline in the value of the security. Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274, 289 (S.D.N.Y. 2004) (interpreting requirements for pleading loss causation in Suez Equity and Emergent Capital). The Supreme Court instructs that a plaintiff must allege that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." Dura Pharmaceuticals, 125 S. Ct. at 1633 (2005); see In re Parmalat, 2005 WL 1527674, at *16. "To plead loss causation, the complaint must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 175 (2d Cir. 2005). "[T]he damages suffered by plaintiff must be a foreseeable

27

consequence of any misrepresentation or material omission."
Emergent Capital, 343 F.3d at 197 (internal citation omitted);
see also In re Parmalat, 2005 WL 1527674, at *16.

**A.**

In their first set of allegations, the plaintiffs allege
that Banc of America failed to disclose that Heilig-Meyers
lacked any centralized billing system or centralized database of
obligors, which made it doubtful that a replacement servicer
could step in quickly or effectively if Heilig-Meyers were
unable to perform.  The plaintiffs merely recycle their earlier
allegations in the Original Complaint concerning Heilig-Meyers'
covenant that it would satisfy its obligations as the servicer
of the installment sales Contracts.  Those allegations were
insufficient to allege material misstatements and omissions in
view of the disclosures of a decentralized credit and collection
system.  See AIG, 254 F. Supp. 2d at 381-84.  The plaintiffs now
allege that although the Court's prior Opinion showed that there
was a sufficient disclosure of the decentralized collections
process, there was a failure to disclose the lack of a
centralized billing process.  Moreover, the plaintiffs allege
that the existence of the Backup Servicing Agreement, which was
allegedly not disclosed to the plaintiffs before they purchased

the securities, "may not have been sufficient to effect a prompt
and smooth transfer of servicing." (Amend. Compl. ¶ 87.)

The plaintiffs' new allegations with respect to Heilig-
Meyers' billing practices are insufficient to allege false or
misleading statements in light of the significant disclosures
made by the defendant regarding both the billing and collection
practices of Heilig-Meyers. Moreover, the plaintiffs fail to
point to any misstatements that represented the existence of a
centralized billing process. The plaintiffs do not provide any
explanation why the lack of a centralized billing process is any
different from the lack of a centralized collections process.
The disclosures regarding the decentralized collections process,
which are not now challenged, did not suggest that there was a
centralized billing process. There is no reasonable basis to
find, in view of the disclosures made, that an additional
disclosure regarding the absence of centralized billing was a
material omission. Further, there are no factual allegations to
support a conclusion that the failure to disclose the existence
of a beneficial Backup Servicing Agreement was the failure to
disclose a material fact.

Finally, there are insufficient allegations to find that
the failure to disclose the absence of a centralized billing
system or the existence of the Backup Servicing Agreement was

29

the proximate cause of any losses suffered by the plaintiffs. The plaintiffs have alleged that their loses stemmed from Heilig-Meyers' failure to continue servicing and the trustee's failure to provide adequate backup servicing. At most, the plaintiffs have alleged transaction causation – that they would not have purchased the securities if they had known about these facts, but they have not adequately alleged that their losses were proximately caused by any failure to disclose these facts.

**B.**

In their second set of allegations, the plaintiffs claim that Banc of America misrepresented Heilig-Meyers' loss and delinquency rates under the Contracts, specifically, that Banc of America indicated that the Contracts controlled by the Trust had favorable loss and delinquency rates, and that these rates were lower than those of other successful retailers. The plaintiffs allege that such statements were false and misleading because Heilig-Meyers used recency accounting to decrease artificially their delinquency rates. According to the plaintiffs, Banc of America also knew but failed to disclose the fact that the comparison figures provided in sales and Offering memoranda did not account for the fact that Heilig-Meyers calculated losses differently from the method used by other retailers. Moreover, Heilig-Meyers allegedly maintained two

sets of books relating to loss and delinquency, one set using recency accounting that deemed "current" many obligors who were allegedly past due on one or more payments or should have been treated as chargeoffs, and the other set using the contractual method of accounting traditionally used by most retailers which accurately reflected the payment status of obligors.

In the prior Opinion, the Court concluded that there were sufficient indications that Heilig-Meyers used a form of recency accounting, and there were no allegations that this was an unacceptable method of accounting. See AIG, 254 F. Supp. 2d at 385-386. The Amended Complaint, however, adds new allegations that comparisons between Heilig-Meyers and other retailers were materially misleading and showed Heilig-Meyers in a materially better position than it would have been had all rates provided to the plaintiffs been based on the same contractual accounting method. Moreover, the new allegations regarding the existence of two sets of Heilig-Meyers records that were disclosed to Banc of America but not to the plaintiffs also suggests that Banc of America was aware that recency accounting was being used without any disclosure to the plaintiffs, and was being used to present false comparisons of collection rates between Heilig-Meyers and other retailers. These new allegations concerning recency accounting cannot be ignored. In addition, the plaintiffs have

sufficiently alleged loss causation because it was reasonably foreseeable that the materially misleading omissions, caused by the use of recency accounting, had overstated the Trust's ability to collect on its assets and that those omissions were the reason for the plaintiffs' losses.

## C.

The plaintiffs allege that the defendant, in the 1998-1 and 1998-2 Offering Memoranda, materially misrepresented the aggregate total amount owed under the Contracts, as well as the principal balances and unearned finance charges due. Specifically, the plaintiffs allege that the Contract balance in September 2000 was overstated by $30 million and that, in turn, overstated value of the collateral because the principal balance is more important than the finance charge component in the ability of the Trust to collect. (See Amend. Compl. ¶ 114.) Banc of America allegedly knew that such figures were not actual figures but were instead based on historical estimates, and that the estimates were shown to be wrong in a subsequent report prepared by a third-party servicer, OSI. (Amend. Compl. ¶ 113.) The added reference to the OSI report is much more precise than the allegations in the Original Complaint. The Amended Complaint alleges specifically that the Contract balance was computed in a materially misleading way that was in fact wrong

at the time it was issued.  The previous Opinion's concerns regarding "fraud by hindsight," see AIG, 254 F. Supp. 2d at 386-87, has now been resolved by the plaintiffs' new allegations. The plaintiffs have also pleaded loss causation because the Amended Complaint alleges that the Contract balance was inflated as a result of the misrepresentations, and the fair import of the Amended Complaint is that it was an inability to collect on the Contract balances that produced the plaintiffs' losses. (See Amend. Compl. ¶ 114.)  Therefore, although it is not directly alleged in the Amended Complaint, a reasonable juror could infer that because the Contract balance was overstated, there was not enough collateral to support interest and principal payments.  Accordingly, the plaintiffs have adequately alleged that Banc of America made false and misleading statements regarding the Contract balances in connection with the 1998-1 and 1998-2 Offerings and that they have pleaded loss causation with respect to these misrepresentations.

### D.

The plaintiffs contend that Banc of America failed to disclose the fact that the proceeds that Banc of America received from the 1998-1 and 1998-2 Offerings would be used to pay off the defendant's prior investment in the 1997-1 Certificates, which Banc of America had not resold and continued

to hold.  This alleged omission was previously discussed and dismissed in the prior Opinion and there is nothing about the Amended Complaint that changes that conclusion.  See AIG, 254 F. Supp. 2d at 387-88.  Given the disclosures made by the defendant in the Offering Memoranda regarding the use of the proceeds of the 1998 Offerings to repay the 1997-1 Series in its entirety, the alleged omissions cannot be found to be materially false or misleading.  See AIG, 254 F. Supp. 2d at 387-88.

In addition, the plaintiffs have not alleged loss causation from Banc of America's alleged conflict of interest.  There is no adequate allegation that the plaintiffs' losses were caused by the defendant's failure to disclose that it would receive proceeds from the 1998 Offerings.  Indeed, the AIG plaintiffs appear to concede that the alleged conflict of interest is not the basis for a claim of misrepresentation or omission, but rather that the conflict is the plaintiffs' primary basis for establishing scienter.[6]  (See Supp. Mem. of Pls. AIG and AIG

---

[6]  The parties dispute whether the Court can consider certain rating agency reports to decide whether Banc of America made sufficient public disclosures.  Banc of America argues that it did not knowingly deceive the plaintiffs because all information was disclosed in rating agency reports, and that the plaintiffs had a duty to examine these reports before purchasing the securities.  The Court did not refer to or rely on the rating agency reports in its earlier Opinion and focused instead on the Offering Memoranda and other documents used to market the securities that were referred to in the plaintiffs' Original Complaint.  The plaintiffs do not refer to the rating agency

Life in Opp'n to Def.'s Mot. to Dismiss Amend. Compl. at 2-3.)
Banc of America's alleged conflict did not cause the plaintiffs
loss, and the allegation cannot survive a loss causation
analysis.  However, as discussed above, the use of the proceeds
to pay Banc of America's prior investment provides the
plaintiffs with a basis for alleging motive and opportunity with
respect to Banc of America's scienter.

For the reasons explained above, the plaintiffs'
allegations with respect to Heilig-Meyers' system of
decentralized billing and collections, and Banc of America's
alleged conflict of interest, are dismissed.  However, the
plaintiffs' have satisfied the requirements of Rule 9(b) and the
PSLRA with respect to two sets of allegations.  First, the
plaintiffs have satisfactorily alleged that Banc of America knew
that Heilig-Meyers' maintained two sets of books related to its
loss and delinquency experiences, and that the defendant knew
but failed to disclose that the comparisons between Heilig-
Meyers' and similar retailers' loss and delinquency rates in

reports in the Amended Complaint, nor do such reports form the
basis of any of the plaintiffs' current allegations.
Accordingly, the Court does not consider the rating agency
reports on the present motion.  See Chambers, 282 F. 3d at 153
("[A] plaintiff's reliance on the terms and effect of a document
in drafting the complaint is a necessary prerequisite to the
court's consideration of the document in a dismissal motion;
mere notice or possession is not enough.") (emphasis in
original); In re Hudson Tech., Inc. Sec. Litig., No. 98 Civ.
1616, 1999 WL 767418, at *1 (S.D.N.Y. Sept. 28, 1999).

Offering and sales memoranda were based on the recency method rather than the contractual method traditionally used by other retailers. Second, the plaintiffs have satisfactorily alleged that Banc of America reported the total aggregate balances owing on the Contracts without indicating that these amounts were based on historical assumptions rather than actual data known by Banc of America at the time of the Offerings. Accordingly, the plaintiffs' first cause of action for securities fraud under Section 10(b) and Rule 10b-5 survives the defendant's motion to dismiss the Amended Complaint.

## IV.

The defendant alleges that the plaintiffs' federal securities claims are time-barred because the plaintiffs failed to commence this action before the statute of limitations expired. Litigation instituted pursuant to Section 10(b) and Rule 10b-5 "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991); see also Dodds v. Cigna Secs., Inc., 12 F.3d 346, 349 (2d Cir. 1993). The statute of limitations was extended by the Sarbanes-Oxley Act, Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (2002), codified in part at 28 U.S.C. § 1658(b). Under that

statute, the claims brought under Section 10(b) must be brought no later than the earlier of: (1) two years after the discovery of the facts constituting the violation, or (2) five years after such violation. 28 U.S.C. § 1658(b). However, in this case, if the plaintiffs' claim was already time-barred at the time that Sarbanes-Oxley was enacted on July 30, 2002, they would not be revived by that statute. See, e.g., In Re Enterprise Mortgage Acceptance Co. LLC, Sec. Litig., 391 F.3d 401, 403-04 (2d Cir. 2004); In re Worldcom, Inc. Sec. Litig., Nos. 02 Civ. 3288 & 03 Civ. 9499, 2004 WL 1435356, at *7 (S.D.N.Y. June 28, 2004) ("Sarbanes-Oxley does not revive previously time-barred private securities fraud claims."). The defendant in this case argues that the plaintiffs' claim is barred by the one year statute of limitations because the action was commenced on December 13, 2001, more than one year after the plaintiffs' discovery of the facts constituting the alleged fraud.

The one-year statute of limitations on Section 10(b) and Rule 10b-5 claims begins to run when the plaintiffs have either actual or constructive notice of the alleged fraud. See Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 (2d Cir. 1993); Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996). "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has

been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. Such circumstances are often analogized to 'storm warnings.'" Dodds, 12 F.3d at 350 (citations omitted).

The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss. See Vassilatos v. Ceram Tech Int'l, Ltd., No. 92 Civ. 4574, 1993 WL 177780, at *4 (S.D.N.Y. May 19, 1993) (dismissal not appropriate where discovery might yield facts to support or refute plaintiffs' constructive knowledge); Siebert v. Nives, 871 F. Supp. 110, 116 (D. Conn. 1994) (noting that not every case is susceptible to determination of inquiry notice as a matter of law); see also Salinger, 934 F. Supp. at 1408-09. Nonetheless, the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves. Dodds, 12 F.3d at 352 n. 3 ("Where . . . the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate."); In re Integrated

Resources Real Estate Ltd. Partnerships Sec. Litig., 850 F.
Supp. 1105, 1132-33 (S.D.N.Y. 1993) ("Integrated I"); Lenz v.
Associated Inns and Restaurants Co. of America, 833 F. Supp.
362, 370 & n. 7 (S.D.N.Y. 1993); see also Menowitz v. Brown, 991
F.2d 36, 42 (2d Cir. 1993) (affirming dismissal based on finding
that plaintiffs were placed on inquiry notice based on SEC
filings).  The plaintiffs need not be able to learn the precise
details of the fraud, but they must be capable of perceiving the
general fraudulent scheme based on the information available to
them.  Dodds, 12 F.3d at 351 ("An investor does not have to have
notice of the entire fraud being perpetrated to be on inquiry
notice."); In re Integrated Resources Real Estate Sec. Litig.,
815 F. Supp. 620, 637 (S.D.N.Y. 1993) ("Integrated II") ("[T]he
statute is not tolled for a plaintiff's leisurely discovery of
the full details of the alleged scheme.  Instead, the period
runs from the time at which a plaintiff should have discovered
the general fraudulent scheme.") (citations and internal
quotations omitted)).  The available facts must establish the
probability of fraud, however, and not merely the possibility of
fraud.  Lenz, 833 F. Supp. at 373 & n. 10; Integrated II, 815 F.
Supp. at 638; see also Salinger, 934 F. Supp. at 1409.

The Original Complaint in this case was filed on December
13, 2001.  Banc of America argues that the plaintiffs discovered

or should have discovered the facts constituting the alleged violations through Offering Memoranda dated February 20, 1998 and August 20, 1998, and through Heilig-Meyers' 10-K SEC filings in 1999 and 2000, which should have put the plaintiffs on inquiry notice of the alleged misrepresentations and omissions more than one year before the plaintiffs filed this action. The plaintiffs respond that the parties entered into a "Tolling Agreement" that became effective on August 16, 2001, and that allegedly makes the relevant date for purposes of time-bar arguments August 16, 2001 rather than the date that the original complaint was filed. (See "Tolling Agreement" attached as Ex. B to Pls' Mem. of Law in Opp'n to Defs' Mots. to Dismiss [Orig.] Compl.) The plaintiffs argue that they could not have discovered the facts underlying the alleged fraud before August 16, 2000, the date that Heilig-Meyers declared bankruptcy, because, according to the plaintiffs, Banc of America concealed the facts underlying the alleged fraud and assured them that First Union Bank was a reliable backup servicer that would step if there were a Heilig-Meyers bankruptcy.

Banc of America's statute of limitations argument cannot be decided as a matter of law. Although the defendant points to various offering memoranda and SEC filings, Banc of America does not point to sufficient disclosures that should have put the

plaintiffs on notice of the specific misrepresentations asserted by the plaintiffs.  Moreover, in arguing that the plaintiffs' claims are time barred, Banc of America relies on a number of documents outside the pleadings, which allegedly put the plaintiffs on inquiry notice but are not to be considered on this motion to dismiss.  See Chambers, 282 F.3d at 153. Accordingly, the defendant's motion to dismiss the Amended Complaint as time-barred is denied.

## V.

Banc of America has moved to dismiss the plaintiffs' claim for common law fraud and deceit.  In an action to recover damages for fraud under New York law, the plaintiff must prove four elements: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury.  See AUSA Life Ins. Co. v. Ernst and Young, 206 F.3d 202, 208 (2d Cir. 2000)(1996); see also Lewis v. Rosenfeld, 138 F. Supp. 2d 466, 477 (S.D.N.Y. 2001).  A claim for common law fraud under New York law, must also satisfy the requirements of Federal Rule of Civil Procedure 9(b).  See AIG, 254 F. Supp. 2d at 389; Lewis, 138 F. Supp. 2d at 478.  Accordingly, a plaintiff must

41

allege facts that give rise to a strong inference of fraudulent intent.  <u>Lewis</u>, 138 F. Supp. 2d at 478.

For the reasons explained above, with respect to Section 10(b) and Rule 10b-5, two sets of alleged misrepresentations by the plaintiffs in the Amended Complaint survive the defendant's motion to dismiss, but two sets of claims do not and those claims must therefore be dismissed.  <u>See</u> <u>Rich v. Maidstone Fin., Inc.</u>, No. 98 Civ. 2569, 2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002) (noting that "[b]ecause [the elements of common law fraud] are substantially identical to those governing § 10(b), the identical analysis applies.") (internal citation omitted); <u>see</u> <u>also</u> <u>Marcus</u>, 329 F. Supp. 2d at 475.  Accordingly, the plaintiffs' allegations that Banc of America made misleading comparisons to other retailers using recency accounting and that Banc of America reported materially misleading Contract balances, survive Banc of America's motion to dismiss, but the plaintiffs' allegations regarding Heilig-Meyers' decentralized billing and collections practices and Banc of America's alleged conflict of interest are dismissed.

## VI.

Banc of America seeks to dismiss the plaintiffs' claim of negligent misrepresentation because it is allegedly preempted by New York's Martin Act, N.Y. Gen. Bus. Law §§ 352 <u>et</u> <u>seq.</u>  The

plaintiffs argue that the Martin Act does not preempt their negligent misrepresentation claim because the New York Court of Appeals has not considered this issue and intermediate appellate decisions and federal court decisions are split on whether common law negligence-based claims exist. The plaintiffs argue that the available case law recognizing preemption is based on a misreading of an Appellate Division decision holding that there is no implied private right of action directly under the Martin Act. See Horn v. 440 East 57th Co., 547 N.Y.S. 2d 1, 5 (App. Div. 1989). Moreover, the plaintiff argues that preemption of private remedies for negligence is at odds with the Martin Act's goal of enhancing investor protection.

The plaintiffs' arguments ignore the clear weight of authority finding that the Martin Act preempts common law negligent misrepresentation claims. See Marcus, 329 F. Supp. 2d at 475-76 (dismissing negligent misrepresentation claim on preemption grounds and collecting cases). The plaintiffs' negligent misrepresentation claim, accordingly, is without merit. Because the negligent misrepresentation claim is preempted, it is unnecessary to reach Banc of America's argument that the plaintiffs have failed to allege that there was a "special relationship" between the parties.

Finally, the plaintiffs have offered no new arguments to support their claim under Section 12(a)(2) of the Securities Act, which, for the reasons already explained in the prior Opinion, is without merit. See AIG, 254 F. Supp. 2d at 388-89.

## CONCLUSION

The remaining arguments of the parties are either moot or without merit. For the reasons explained above, the defendant's motion to dismiss is **granted in part and denied in part**.

**Dated: New York, New York**
      **September 26, 2005**

**John G. Koeltl**
**United States District Judge**