UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

AIG GLOBAL SECURITIES LENDING CORP.,
ET AL.,

                    Plaintiffs,          01 Civ. 11448 (JGK)

        - against -                      OPINION AND ORDER

BANC OF AMERICA SECURITIES LLC,

                    Defendant.
————————————————————————————

JOHN G. KOELTL, District Judge:

    In 1998, eight institutional investors, the remaining
plaintiffs in this case, purchased asset-backed securities.  The
securities were backed by consumer installment sales contracts
entered into by the now-bankrupt furniture retailer, The Heilig-
Meyers Furniture Company ("Heilig-Meyers").  The institutional
investors claimed that they purchased the securities in reliance
on material misrepresentations and omissions made by a
predecessor of the defendant Banc of America Securities LLC (the
"defendant" or "BAS").  The plaintiffs lost nearly $120 million.
They sued BAS for fraud under both federal and New York state
law.  After a seven week trial, a jury returned a verdict in
favor of the plaintiffs.  The defendant now moves for judgment
as a matter of law pursuant to Federal Rule of Civil Procedure
50(b) or, in the alternative, for a new trial pursuant to
Federal Rule of Civil Procedure 59.  For the reasons explained
below, the motions are **denied**.

The remaining plaintiffs are AIG Global Securities Lending Corporation ("AIG Global"); AIG Life Insurance Company ("AIG Life"); Allstate Life Insurance Company ("Allstate Life"); Banc Leumi USA ("Banc Leumi"); Bayerische Landesbank, New York Branch ("Bayerische"); International Finance Corporation ("IFC"); Société Générale, as Manager for Certain Funding Limited ("SocGen"); and The Travelers Insurance Company ("Travelers") (collectively, the "plaintiffs").

In 1998, the plaintiffs purchased asset-backed securities in two private offerings underwritten by a predecessor of the defendant and First Union Securities, Inc. ("First Union"). The securities were backed by consumer installment contracts entered into by Heilig-Meyers, a specialty retailer of home furnishings that earned substantial revenues by selling furniture through fixed-term, fixed-payment installment sales contracts. After Heilig-Meyers declared bankruptcy in August 2000, the current plaintiffs, together with other institutional purchasers, sued the two underwriters. The Amended Complaint alleged four causes of action: (1) violations of Section 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder ("Rule 10b-5"), 17 C.F.R. § 240.10b-5; (2) violations of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2); (3) common law fraud; and (4) negligent misrepresentation.  The Section 10(b) and Rule 10b-5

claims and the common law fraud claims were based upon four sets of misrepresentations and omissions allegedly made by the defendant to the plaintiffs.

After two motions to dismiss and a motion for summary judgment,[1] and after various institutional plaintiffs settled their claims and all claims against First Union were settled, the only claims that remained were the Section 10(b) and Rule 10b-5 claims by AIG Global, AIG Life, Allstate, IFC, SocGen, and Travelers against BAS, and the common law fraud claims by all eight remaining plaintiffs against BAS, based upon the allegation that BAS misrepresented the loss and delinquency rates of the contracts in the Trust.  In October 2008, the case proceeded to trial on the remaining fraud claims.  After seven weeks of trial, the jury returned a verdict in which it found the defendant liable for violating Section 10(b) and Rule 10b-5 with respect to the six remaining plaintiffs who had brought a Section 10(b) and Rule 10b-5 claim, and for common law fraud with respect to all eight remaining plaintiffs.

On January 5, 2009, the Court entered judgment in favor of the plaintiffs.  Thereafter, the defendant filed these motions.

## I.

It is well-established that a district court should deny a

---

[1] See AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, No. 01 Civ. 11448, 2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005); AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 254 F. Supp. 2d 373 (S.D.N.Y. 2003); AIG

Rule 50 motion unless "viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)) (alteration in original); see also SEC v. Zwick, No. 03 Civ. 2742, 2007 WL 831812, at *2 (S.D.N.Y. Mar. 12, 2007); Fowler v. N.Y. Transit Auth., No. 96 Civ. 6796, 2001 WL 83228, at *1 (S.D.N.Y. Jan. 31, 2001); Dailey v. Société Générale, 915 F. Supp. 1315, 1321 (S.D.N.Y. 1996), aff'd in relevant part, 108 F.3d 451, 457-58 (2d Cir. 1997).

A trial court considering a motion under Rule 50(b) "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." Samuels v. Air Transp. Local 504, 992 F.2d 12, 16 (2d Cir. 1993). A jury verdict should be set aside only when "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive

---

Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, No. 01 Civ. 11448

at a verdict against [the movant]." Logan v. Bennington Coll.
Corp., 72 F.3d 1017, 1022 (2d Cir. 1996) (alteration in
original) (internal quotation marks and citations omitted); see
also Zwick, 2007 WL 831812, at *2.

In the alternative, the defendants move for a new trial
pursuant to Rule 59. See Fed. R. Civ. P. 59(a). In determining
whether a new trial is appropriate under Rule 59(a), a court
applies a less stringent standard than on a motion for judgment
as a matter of law. See Manley v. Ambase Corp., 337 F.3d 237,
244-45 (2d Cir. 2003); Katara v. D.E. Jones Commodities, Inc.,
835 F.2d 966, 970 (2d Cir. 1987). "[F]or a district court to
order a new trial under Rule 59(a), it must conclude that the
jury has reached a seriously erroneous result or . . . the
verdict is a miscarriage of justice, i.e., it must view the
jury's verdict as against the weight of the evidence." Manley,
337 F.3d at 245 (internal quotations and citation omitted).
With respect to the plaintiffs' common law fraud claims, "the
standard is shifted somewhat in favor of [the defendant's]
challenge to the verdict, due to the higher standard of proof
(clear and convincing evidence . . .) required in fraud cases."
Katara, 835 F.2d at 970.

## II.

There was sufficient evidence introduced at trial from

(S.D.N.Y. July 21, 2008).

which the jury could reasonably have found as follows.

In 1998, Heilig-Meyers was the nation's largest publicly held specialty retailer of home furnishings, with over 1,200 stores in 38 states, Washington, D.C., and Puerto Rico.  (D509 at ¶ 30; P2 at BAS 670; P4 at BAS 11832.)  Heilig-Meyers located its stores primarily in small towns and rural markets, and it made the majority of its sales to customers on credit.  (P2 at BAS 672-73; P4 at BAS 11832-33.)

Heilig-Meyers' installment sales program was a key component of its operating strategy.  (D509 at ¶ 31.)  Heilig-Meyers offered its customers extended payment terms on most merchandise purchases under fixed-term, fixed-payment installment sales contracts.  (D509 at ¶ 31.)  Each contract required the customer, or under the contract, the obligor, to make a specific total amount of payments, payable in equal monthly installments, which represented the amount financed plus finance charges.  (Tr. 398; D509 at ¶ 31.)  Each contract was secured by the merchandise that had been financed.  (D509 at ¶ 31.)  Thus, a customer purchasing a couch from Heilig-Meyers could, with an installment sales contract, pay for the couch over a period of time by making a fixed number of monthly payments.  If the customer defaulted, Heilig-Meyers could then repossess the couch.  Heilig-Meyers made a substantial portion of its sales to customers on credit through its installment

sales program.  (D509 at ¶ 31.)

During the mid-1990s, Heilig-Meyers was a banking client of NationsBank, N.A. ("NationsBank"), a national bank affiliated with the defendant, which at that time was known by various names, including NationsBanc Capital Markets and NationsBanc Montgomery Securities (both hereinafter "NationsBanc").  (Tr. 213-15, 220-21.)  NationsBank created NationsBanc, a securities company, in 1992.  (Tr. 213-14.)  Subsequent to the events at issue in this case, NationsBank merged with Bank of America, and NationsBanc became what is now Banc of America Securities.  (Tr. 212.)

NationsBank, the bank, established a conduit called the Enterprise Funding Corporation ("EFC") to make loans to its best clients, which included Heilig-Meyers.  (Tr. 221-22, 224, 2541-42.)  Virtually all of these loans were backed by the client's assets.  (Tr. 222.)  Through the EFC, NationsBank made hundreds of millions of dollars of loans to Heilig-Meyers, which were backed by income from the installment sales contracts, also referred to as "receivables."  (Tr. 230, 282, 286.)

Each time the EFC extended credit to a client, NationsBank issued an internal document called a credit approval report ("CAR").  (Tr. 242.)  Each CAR assigned a risk rating on the credit quality of the company to which the loan was being made.  (Tr. 243.)  The ratings scaled from 1 to 10, with 1 being the

best rating possible, 5 or better being investment grade, and 10 being the worst.  (Tr. 243.)

In the mid-1990s, Heilig-Meyers' financial condition began to deteriorate.  An internal due diligence report drafted by NationsBanc in October 1996 disclosed that Heilig-Meyers' average default and delinquency ratios in its receivables portfolio had steadily increased over the period from March 1993 to August 1996.  (Tr. 288; P10 at BOA 10302.)  NationsBank, however, continued to extend credit to the company, although the CARs issued with each extension of credit reflected a downward trend in the credit quality of the company.  Heilig-Meyers went from being rated a "4" as of July 11, 1995, to a "5" as of December 16, 1996, to a "7" as of February 18, 1998, and finally to an "8" as of June 29, 1998.  (Tr. 302, 320, 351-52, 401; P19 at BAS 22014; P32; P38).

In January 1997, to help Heilig-Meyers bridge its funding needs after another bank chose not to participate in a planned lending facility, NationsBank planned to increase temporarily its total corporate exposure to Heilig-Meyers to levels which were a source of concern within the bank.  (Tr. 311-15, 2638-39; P14 at BASE 88983; P28.)  To reduce its anticipated exposure to Heilig-Meyers, NationsBank planned to raise $300 million for Heilig-Meyers in the term market and to use the proceeds to pay down some of NationsBank's loans to Heilig-Meyers.  (Tr. 315-16;

P28 at BAS 25773-74.)

In February 1997, the Heilig-Meyers Master Trust ("Trust") was formed for the purpose, among others, of monetizing a substantial portion of Heilig-Meyers' installment contracts through the issuance of a series of asset-backed securities – fixed income instruments serviced by cash flows from consumers making payments on their installment contracts. (D509 at ¶ 3.) Heilig-Meyers, as the servicer of the Trust, was primarily responsible for servicing and administering the contracts in the Trust, which entailed billing obligors, collecting payments from obligors, and maintaining internal records and databases. (Tr. 2542; D509 at ¶ 33.) First Union, as the trustee, was to act as the back-up servicer in the event that Heilig-Meyers was unable to continue or was removed as servicer. (Tr. 655-56, 714, 867, 896, 2610-11.)

The Trust issued three series of asset-backed securities: one in 1997, and two in 1998. (Tr. 235; D509 at ¶¶ 34-36.) In February 1997, the Trust issued a series of securities called the Variable Funding Certificates, Series 1997-1 (the "1997-1 Certificates"), in which NationsBank invested. (Tr. 414; P2 at BAS 756; P4 at BAS 11917.) In February 1998, the Trust issued several classes of interests as part of Series 1998-1, including Class A Certificates and Class B Certificates (collectively, the "1998-1 Certificates") in the aggregate original principal

amount of $368 million (the "1998-1 Offering"). (D509 at ¶ 35.)

In August 1998, the Trust issued several classes of interests as

part of Series 1998-2, including Class A Certificates and Class

B Certificiates (collectively, the "1998-2 Certificates") in the

aggregate original principal amount of $280 million (the "1998-2

Offering"). (D509 at ¶ 36.)   The classes indicated the

seniority of the tranche of Certificates, according to which the

Class A Certificate holders would be repaid their principal

first, followed by the Class B Certificate holders. (Tr. 977-

79.)

     The 1998-1 Class A Certificates were backed by contracts in

the Trust plus 2% cash collateral that together possessed 31.5%

more value than the face value of the Certificates. (Tr. 977-

78; P5 at BAS 5550; P208.)   This additional value, also called a

"credit support" or a "credit enhancement," served as a cushion

to protect investors in the event that there was a shortfall in

principal to pay back investors. (Tr. 684, 845, 978.)   The

1998-1 Class B Certificates had a 17.5% credit enhancement, also

including 2% cash collateral. (P5 at BAS 5550; P208.)   The

1998-2 Certificates had similar levels of credit support: 35%

for the Class A Certificates and 20.25% for the Class B

Certificates, both including 3% cash collateral. (P6 at BAS

5599; P218.)   In both offerings, the Class A Certificates were

rated in the highest rating category by the rating agencies, and

the Class B Certificates were rated in one of the three highest rating categories by the rating agencies.  (D509 at ¶ 38.)

NationsBanc, as initial purchaser, sold the 1998-1 and the 1998-2 Certificates in Rule 144A offerings to qualified institutional investors, including all eight of the plaintiffs in this case.  (D509 at ¶¶ 10, 21, 37.)  The proceeds of those two offerings were then used to repay a significant portion of the money NationsBank had invested in purchasing the 1997-1 Certificates.  (Tr. 1441-43.)

The plaintiffs sought to prove at trial that NationsBanc made false statements and omitted material facts which led investors to believe that the contracts in the Trust were of a higher credit quality than they actually were.  According to the plaintiffs, NationsBanc did this in four ways: (1) by presenting the loss and delinquency statistics for the Trust based on a recency method that materially masked nonpayment by Heilig-Meyers' customers; (2) by omitting the fact that Heiling-Meyers maintained a separate set of aging statistics that would have revealed the poor credit quality of the receivables; (3) by comparing the loss and delinquency statistics for the Trust with those of other retailers, without disclosing the fact that a number of the other retailers used a more conservative aging methodology; and (4) by omitting the ways that Heilig-Meyers materially misapplied the recency method, such as by allowing

judgmental overrides and add-ons.  Based on the evidence presented at trial, the jury reasonably could have found that NationsBanc misrepresented the credit quality of the receivables in the Trust in all four of the ways alleged by the plaintiffs.

NationsBanc provided a copy of the 1998-1 Preliminary Offering Memorandum to AIG Life, Allstate, Bank Leumi, Bayerische, and Travelers, and a copy of the 1998-2 Preliminary Offering Memorandum to AIG Global, AIG Life, Allstate, SocGen, and Travelers.  (D509 at ¶¶ 5-9, 17-20.)  The 1998-1 and the 1998-2 Preliminary Offering Memoranda disclosed to investors over 120 pages of information about the Trust Certificates, Heilig-Meyers, and the underlying contracts in the Trust.  (P1; P3.)  Included in these disclosures were statistics on Heilig-Meyers' loss and delinquency experience which had been prepared using a method called recency accounting.  Under recency accounting, a contract is charged-off if the obligor has made no payments over a period of six months.  Recency accounting differs from contractual accounting, in which a contract is charged-off if the obligor has not paid in full after a period of six months.

NationsBanc's internal documents describe recency accounting as the "least conservative" method of accounting for losses and delinquencies and as understating losses and delinquencies when compared to the contractual method for

calculating loss and delinquency rates.  (Tr. 240-41; P8 at BAS 23508; P17 at BAS 22195.)  These same documents described contractual accounting as "the industry standard," as the "most conservative" method of accounting for losses and delinquencies, and as representing "a more actual and straightforward snapshot of past due payments."  (Tr. 921-22; P8 at BAS 23508, 23511.) The contractual method is also, by law, the required form of reporting for all bank-issued credit cards.  (Tr. 223, 2546.) According to internal NationsBanc documents, contractual loss and delinquency rates were much higher than the recency numbers, typically more than twice as great.  (P43.)  An internal report, for example, indicated that during the period from March 1993 to July 1996 delinquencies reported under the contractual method were 2.34 times greater than delinquencies reported under the recency method.  (P10 at BAS 10296.)

The Preliminary Offering Memoranda did not refer to the use of recency accounting by name, but rather included the following explanation of Heilig-Meyers' charge-off policy:

> Amounts due under a Contract will generally be considered charged-off for purposes of the Agreement if one of the following circumstances occurs: (i) <u>180 days have elapsed since the last full payment on such Contract</u>; (ii) the goods securing repayment of such Contract are repossessed; (iii) such Contract is transferred from a Retail Store to the Credit Center after notification that the related obligor has declared bankruptcy; or (iv) such amounts are deemed by the Servicer to be not collectible and are subsequently charged-off.

(Tr. 323; P1 at BAS 2740; P3 at BAS 11959) (emphasis added).

The Preliminary Offering Memoranda did not otherwise mention
recency accounting, contractual accounting, or the fact that
recency accounting tended to understate the actual loss
experience of the contracts in the Trust.  (Tr. 603-05, 1590-91;
P1; P3.)

     The jury also heard evidence that Heilig-Meyers maintained
credit statistics internally on a contractual and on a recency
basis, and that it shared these statistics with NationsBanc on a
regular basis.  In Heilig-Meyers' own records, the contractual
statistics were labeled "Primary Delinquency %," and the recency
statistics were labeled "Secondary Delinquency %."  (P42.)
However, the Preliminary Offering Memoranda did not make any
mention of the fact that separate contractual numbers existed,
(Tr. 324, 356-57, 382-83, 605), and NationsBanc never indicated
to the plaintiffs that contractual numbers existed (Tr. 1119).

     In its communications with investors, NationsBanc also made
misleading comparisons between Heilig-Meyers and other
retailers.  NationsBanc held two conference calls with
investors, one before the 1998-1 Offering and the second before
the 1998-2 Offering, in which Heilig-Meyers' charge-off
experience was compared with other retailers, including Neiman
Marcus, JC Penney, Dayton Hudson, The Limited, and Federated
Department Stores, and in which investors were told that Heilig-
Meyers had lower loss rates than all of the other retailers

except for Neiman Marcus.  (Tr. 562-71, 591-94, 632-34; P208;
P218.)  However, the loss rates of some of the other retailers,
including both Dayton Hudson and Federated, were based on
contractual numbers and were therefore not comparable to Heilig-
Meyers' loss rates, which were based on recency numbers.  (Tr.
276; P9 at BOA 10342.)

NationsBanc also disseminated sales memoranda to some of
the plaintiffs, which were short documents that summarized the
most important details of the deal and which were given to
potential investors to help them decide whether to purchase the
Certificates.  (Tr. 383-84, 955.)  A one-page sales memorandum
faxed to both Bank Leumi and Bayerische in connection with the
1998-1 Offering described Heilig-Meyers as having a "[s]uperior
credit experience" and "loss rates substantially lower than most
retail."  (Tr. 1667; P403; P501.)  The memorandum listed Heilig-
Meyer's loss rate as 7.1%, which was the lowest loss rate among
a group of eight other retailers.  (Tr. 988-89, 1665-68; P403;
P501.)  The memorandum also included the description
"Conservative Accounting treatment."  (Tr. 993, 1669; P403;
P501.)  An eleven-page sales memorandum emailed to SocGen in
connection with the 1998-2 Offering (the "1998-2 Sales
Memorandum") listed Heilig-Meyers' loss rate as 7.2%, excluding
the effect of a one-time write-off, and included comparisons
which portrayed Heilig-Meyers as having lower loss rates than

most other retailers listed in the Memorandum.  (P704A.)  The
page in the 1998-2 Sales Memorandum which included Heilig-
Meyers' loss rates and comparisons to the loss rates of other
retailers was also faxed to IFC.  (P604.)  That page of the
1998-2 Sales Memorandum also stated that "[l]oss rates have
shown a great deal of stability since 1994," and that "[l]oss
rates are lower than for most retailers."  (P604; P704A.)

    The plaintiffs also presented evidence based on which a
reasonable jury could have found that the loss and delinquency
numbers provided to investors by NationsBanc materially
misrepresented Heilig-Meyers' actual loss and delinquency
experience even on a recency basis.  First, Heilig-Meyers had a
"judgmental override" policy, under which store managers could
charge off accounts later than it would otherwise charge them
off under recency accounting if the store manager had reason to
believe that payment was imminent.  (Tr. 287-88; P10 at BAS
10297-98.)  Second, Heilig-Meyers also had a policy under which
delinquent obligors could be reclassified as current if they
made another purchase on credit from Heilig-Meyers -- what
Heilig-Meyers termed an "add-on" purchase.  A due diligence
report prepared by NationsBanc after a visit to Heilig-Meyers'
corporate headquarters in October 1996 described Heilig-Meyers'
use of "add-ons":

        If the customer, who has an existing installment contract,
        decides to buy something else from Heilig and finance it as

-16-

well, new merchandise will be added on his/her existing
contract.  Monthly payments, finance charges and term of
the contract will be recalculated.  The amended contract
will retain its number.  Even if the existing contract was
delinquent, after an add-on it will be considered current.

(Tr. 291; P10 at BOA 10295.)  In a section entitled "Substituted

Contracts," the Offering Memoranda explained how the Trust

treated such add-on contracts:

> If an obligor with respect to an existing Contract desires
> to purchase additional goods or services on credit from an
> Originator . . . , such existing Contract and the related
> Trust Property will be automatically transferred to the
> applicable Originator, a new Contract will be automatically
> originated in substitution for such existing Contract and
> such new Contract and the related Trust Property will be
> automatically transferred to the Trust.

(P2 at 693; P4 at BAS 11853.)  The plaintiffs stipulated that

these add-on purchases "constituted *at least* 30% of total

Contract Receivables growth."  (D510 at ¶ 39 (emphasis in

original).)

Relying on these communications, the plaintiffs, in

aggregate, purchased $226.75 million original principal amount

of the 1998-1 and 1998-2 Certificates, $220.5 million from the

defendant and $6.25 million from First Union.[2]  (P940-50; D509.)

On behalf of AIG Global, the Bank of New York purchased $54.25

---

[2] In the plaintiffs' trial exhibits containing their damages analysis,
Travelers is listed as having purchased an aggregate amount of $31 million of
the 1998-1 and 1998-2 Certificates.  (P940; P949; P950.)  However, the
Parties' Stipulations of Fact state that Travelers purchased an aggregate
amount of $41 million.  (D509 at ¶ 148-50.)  The Court assumes that the lower
figure contained in the damages analysis exhibits is either the correct
figure or, in any event, the amount on which Travelers based its damages
analysis and sought recovery.

million original principal amount of the 1998-2 Certificates.[3]
(D509 at ¶¶ 46-47.)  AIG Life purchased $7 million original
principal amount of the 1998-1 Certificates (D509 at ¶¶ 11, 57),
and $7.5 million original principal amount of the 1998-2
Certificates from the defendant (D509 at ¶¶ 22, 58-59).
Allstate purchased $20 million original principal amount of the
1998-2 Certificates from the defendant.  (D509 at ¶¶ 23, 79.)
IFC purchased $20 million original principal amount of the 1998-
2 Certificates from the defendant.  (D509 at ¶¶ 24, 124.)  Bank
Leumi purchased $5 million original principal amount of the
1998-1 Certificates from the defendant.  (D509 at ¶¶ 12, 97.)
Bayerische purchased $50 million original principal amount of
the 1998-1 Certificates from the defendant.  (D509 at ¶ 13.)
Travelers purchased $26 million original principal amount of the
1998-1 Certificates (D509 at ¶¶ 15-16, 148-49), and $15 million
original principal amount of the 1998-2 Certificates from the
defendant (D509 at ¶¶ 28, 150).

SocGen purchased $32 million original principal amount of
the 1998-2 Certificates in August 1998.[4]  (D509 at ¶¶ 26-27,
132.)  After SocGen purchased the 1998-2 Certificates, it made a
separate decision to sell the Certificates to Certain Funding,
an arbitrage conduit sponsored by SocGen.  (D509 at ¶¶ 136,

---

[3] AIG Global purchased $50 million from the defendant and $4.25 million
from First Union.  (D509 at ¶¶ 46-47.)

138.)  In October 1998, a member of SocGen's securitization team prepared a credit application for the sale of the 1998-2 Certificates to Certain Funding.  (D509 at ¶¶ 135, 139.)  In November 1998, SocGen sold the Certificates to Certain Funding. (D509 at ¶ 143.)

On August 16, 2000, Heilig-Meyers filed for bankruptcy. (D509 at ¶ 29.)  At that time, Heilig-Meyers also stopped servicing the contracts in the Trust.  (Tr. 2610.)  First Union, however, did not step in to take over servicing of the contracts in the Trust.  (Tr. 897, 2611.)  For several months after the bankruptcy, until a new servicer was brought in, collection rates on the contracts deteriorated.  (Tr. 2111, 2216, 2616-17.) Ultimately, only $578 million in both principal and finance charges was actually collected by the Trust, compared with the approximately $1 billion of principal and finance charges that were supposed to be available to pay back investors.  (Tr. 2111-12.)

The plaintiffs filed this lawsuit against the defendant and First Union on December 13, 2001.  (Tr. 2271.)  On December 21, 2001, the plaintiffs also filed a separate complaint against First Union as trustee, asserting various claims arising out of First Union's failure to act as the back-up servicer after Heilig-Meyers' bankruptcy.  (Tr. 2271; D1.)  The plaintiffs

---

[4] SocGen purchased $30 million from the defendant and $2 million from

reached a settlement with First Union in the amount of $30 million.  (Tr. 657, 1010, 1126, 1801, 1848, 2012; P941-50.)  In total, after subtracting the $30 million settlement that the plaintiffs obtained from First Union, the plaintiffs lost an aggregate amount of approximately $85 million.  (P941-50.)

This is only a summary of some of the evidence from the seven week trial which is recounted here to place the defendant's motions in perspective.

### III.

The defendant argues that it is entitled to judgment as a matter of law or a new trial on multiple grounds.  The Court addresses each argument in turn.

### A.

First, the defendant argues that it is entitled to judgment as a matter of law, or in the alternative, a new trial, because the testimony of the plaintiffs' expert witness, Henry Owsley ("Owsley"), did not prove that the defendant's conduct caused the plaintiffs' losses.

On both the federal securities fraud claim and the New York common law claim, the plaintiffs bore the burden of proving loss causation.  See Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495-96 (2d Cir. 1992).  To show loss causation, a plaintiff must show that the misstatement or omission was the "proximate

---

First Union.  (D509 at ¶ 132.)

cause" of an investment loss--in other words, that "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original).[5]  Thus, the issue is whether the plaintiffs adduced sufficient evidence at trial to show that the defendant's misstatements and omissions concealed a risk that caused the plaintiffs' losses.

**1.**

The defendant does not dispute on the current motions that Owsley was qualified by his education, training, and experience to render the opinions that he gave.  (See Tr. at 2066-81.) Rather, the defendant claims that Owsley's opinion with respect to loss causation was defective as a matter of law.

The plaintiffs relied on Owsley's expert testimony, supported by the evidence in the case, to prove loss causation. Owsley and his colleagues spent hundreds of hours analyzing the Heilig-Meyers securitization.  (Tr. 2086-88.)  Owsley's testimony centered on a computer model that he built to simulate the flow of cash that came into and out of the Trust.  (Tr. 2097-98.)  The objective of the model was to be able to compare

---

[5] A plaintiff must prove both transaction causation and loss causation. Transaction causation requires the plaintiff to prove that "but for" the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.  See Lentell, 396 F.3d at 172. In the current motions, the defendant challenged the sufficiency of the proof of loss causation but not transaction causation.

the amount of cash that the Trust should have collected if the Trust's default rates were actually as they had been reported to the amount of cash that was actually collected by the Trust. (Tr. 2099.)  Owsley obtained data on actual collections from monthly servicer reports that were prepared by Heilig-Meyers for each month that the securitization was in existence.  (Tr. 2092.)

To construct the model itself, Owsley relied on information in the 1998-1 Offering Memorandum, the sales memoranda, and the monthly servicer reports.  (Tr. 2097-99, 2102, 2168.) Consistent with the data contained in those documents, his model assumed that the contracts going into the Trust had an average contract term of 17.5 months at the time the contracts were originated.[6]  (Tr. 2098; P2 at BAS 677; P4 at 11837; P5 at BAS 5553; P6 at BAS 5601.)  The model further assumed a default rate of 7.5%, in line with the various rates quoted by NationsBanc as the default rate of contracts in the Trust.  (Tr. 2098.)

Owsley's model showed that actual collections were only 87.5% of what collections should have been had the contracts in the Trust had a 7.5% default rate.  (Tr. 2103.)  In other words, the model showed that 12.5% less cash was coming in than should have been collected.  (Tr. 2103.)  Based on these results,

---

[6] The 1998-1 Sales Memorandum stated that the average contract term at origination was 17 months, rather than 17.5, but the other offering materials, including the 1998-1 and 1998-2 Offering Memoranda and the 1998-2

Owsley concluded that the real default rate of the contracts in
the Trust was roughly 20%.  (Tr. 2105.)

      Based on these results, Owsley concluded that the default
rate of the contracts in the Trust was much higher than had been
disclosed, roughly 12.5% higher, and that this higher default
rate was the cause of the plaintiffs' losses.  (Tr. 2089.)
According to Owsley, a portion of the money collected was to be
used to purchase new contracts to replace defaulted contracts in
the Trust.  However, because the Trust used the lower 7.5%
default rate to replace receivables, it was not replacing a
sufficient amount of receivables to retain the value of the
Trust.  Rather, the monies were used to pay Heilig-Meyers.  (Tr.
2105-06.)  When the securitizations went into early
amortization, triggered by Heilig-Meyers' bankruptcy, there was
not enough value in the Trust to pay back investors.  (Tr. 2106-
07.)  Owsley calculated that the shortfall resulting from the
higher true default rate was in the range of $300 million to
$400 million.  (Tr. 2106.)  Based on Owsley's testimony, a
reasonable jury could have found clear and convincing evidence
that NationsBanc's misrepresentations caused the plaintiffs'
losses.

      The defendant's first criticism of Owsley's model is that
his model allegedly failed to take into account the effect of

---

Sales Memorandum state that it was 17.5 months.  (P2 at 677; P4 at 11837; P5

"add-ons" on the average maturities of the contracts in the Trust.  The defendant argues that because Owsley's testimony is contradicted by "undisputed evidence," it cannot support the jury's verdict.  Expert testimony that is in fact contradicted or rendered unreasonable by undisputed record evidence cannot support a jury's verdict.  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993).  However, there was no undisputed evidence on add-ons presented at trial that contradicted or rendered unreasonable Owsley's conclusions.

It was undisputed that Heilig-Meyers permitted customers to "add-on" new purchases to their existing contracts.  A due diligence report on Heilig-Meyers prepared by NationsBanc in October 1996 indicates that when add-ons occurred, monthly payments, finance charges, and the term of the contract were recalculated.  (P10 at BOA 10295.)  The parties also stipulated "that add-on purchases constituted *at least* 30% of total Contract Receivables growth.  (*See, e.g.*, DX 566A [Ex. 185] ¶ 12 (Plaintiffs' expert, Henry Owsley, notes that Heilig rewrote at least $100 million of Trust Receivables after December 31, 1997).)."  (D510 ¶ 39 (emphasis in original).)  There was also uncontroverted evidence that contracts did not have original contract terms of more than 38 months, but that up to 29% of the outstanding contract balance of the Trust was composed of

at BAS 5553; P6 at BAS 5601.)

contracts older than 36 months.  (Tr. 2473-75; P2 at BAS 677,
679.)  This evidence indicates that up to 29% of the outstanding
contract balance of the Trust was composed of contracts that had
been extended through an add-on purchase.

The defendant asserts that Owsley admitted that his model
did not take add-ons into account, and that his testimony is
therefore contradicted by these undisputed facts.  However, that
is not quite what Owsley said during his cross-examination.
Owsley responded to the questions of defense counsel as follows:

> Q:  Now, your model did not take into account the fact that
> possibly 300,000 of these contracts were extended, correct?
>
> A:  Our model implicitly took into account the cash flows
> from any contract whether extended or otherwise because we
> didn't distinguish from where a dollar came from, an
> extended contract or a nonextended contract.
>
> Q:  Let me see if I can go at it another way.  You did not
> incorporate rewrites of nondelinquent contracts in your
> model?
>
> A:  That is correct.
>
> Q:  You did not account for the longer maturity of the
> rewritten contracts in preparing your model?
>
> A:  That is correct.

(Tr. 2163.)  Owsley did testify that his model did not
explicitly factor add-ons into his model, but he also testified
that his model implicitly accounted for cash flows from all
contracts, whether they were extended or not.  Therefore, it is
not correct to state that his model did not take into account
the effect of add-ons.

Moreover, Owsley's conclusions found independent support in the record evidence.  Owsley testified that he built the model assuming that all new contracts added to the Trust had an average maturity at origination, that is, at the time of purchase, of 17.5 months.  (Tr. 2098.)  As the model simulated the flow of contracts over time, from the beginning of the securitization to the expected final date, the average remaining term of the contracts in the model worked its way down to 13.5 months.  (Tr. 2165-66.)  This figure was consistent with NationsBanc's own disclosures in the 1998-1 and 1998-2 Sales Memoranda, which stated that the average contract term for the contracts in the Trust at the time the contracts were originated was 17 or 17.5 months, and that the average remaining term of the contract pool was 13.5 months.  (Tr. 2166; P5 at BAS 5553; P6 at BAS 5601.)  Both the 1998-1 and the 1998-2 Sales Memoranda further stated that these statistics had been consistent since 1989.  (P5 at BAS 5553; P6 at BAS 5601.)[7]  In other words, the jury could reasonably conclude that the evidence showed that, whatever the extent of add-ons, the average contract term for

_____

[7] The defendant also argues that it is undisputed that the average remaining maturity of the Trust remained stable at 17.5 months between December 31, 1997, the reporting date used in the 1998-1 Offering Memorandum, and June 30, 1998, the reporting date used in the 1998-2 Offering Memorandum. (Tr. 2164-65, 2321-28; P2; P4.)  However, this figure was not undisputed. Both Owsley and Carron testified that the average remaining maturity implied by the data in the 1998-2 Offering Memoranda conflicted with the NationsBanc internal sales memoranda, which stated that the average remaining maturity was 13.5 months.  (Tr. 2163-69, 2379-83; P5; P6.)

the contracts in the Trust at the time of origination was 17.5
months, the statistic that Owsley used, and that this was indeed
consistent over time.

Moreover, the fact that add-ons occurred does not say much
about how the monthly payments on those contracts changed.[8]
Nonetheless, the defendant argues that Owsley's failure
explicitly to factor contract extensions into his model renders
the model fatally flawed.  However, other than the testimony of
the defendant's expert, Andrew Carron ("Carron"), the defendant
did not present any evidence that showed what impact add-ons
actually had on the contracts in the Trust, nor that this impact
was not accounted for in Owsley's model.  Nothing about this
evidence would have made it unreasonable for the jury to credit
Owsley's testimony that any effect of add-ons was captured by
his model, and that the higher default rate of contracts in the
Trust caused the plaintiffs' losses.

The only other evidence on add-ons that the defendant
introduced was Carron's expert testimony.  As the defendant
concedes, however, the jury was free to disbelieve Carron's
testimony.  (See Reply Mem. 4.)  See also Nimely v. City of New

---

[8] In support of its contention that add-ons significantly altered the
average life of contracts in the Trust, the defendant proffered various
hypotheticals in its Memorandum in support of the current motion.  However,
hypotheticals are nowhere in the trial evidence and make assumptions about
how contract terms and monthly payment terms would be altered by add-ons, but
the defendant fails to support its assumptions with evidence as to how the
add-ons were actually calculated and whether those calculations were
consistent throughout Heilig-Meyers contracts, as well as the overall effect

York, 414 F.3d 381, 397-98 (2d Cir. 2005); In re Joint E. & S.
Dist. Asbestos Litig., 52 F.3d 1124, 1135 (2d Cir. 1995);
McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1045 (2d Cir. 1995).
Indeed, there was ample reason for the jury to reject Carron's
testimony.  Carron used Owsley's model but contended that
various changes should be made.  Carron used an average
remaining term of the contracts in the Trust of 17.5 months, a
figure that was inconsistent with BAS's own sales memoranda that
indicated a constant average remaining term of 13.5 months.
Carron was simply unable to reconcile the conflicting evidence.
(Tr. 2412-13, 2384-85.)  Moreover, to achieve an average
maturity of 17.5 months for the contracts in the pool, Carron
manipulated the average maturities for the contracts he placed
into the pool in his model so that the average maturity for the
contracts in the pool came out to be 17.5 months.  (Tr. 2413-14;
P955.)  Overall, the average term at origination of Carron's
monthly additions was 24.2 months (P955), a term that could not
be squared with the consistent evidence that the average
maturity of the contracts in the Trust was 17.5 months at
origination.  (P2 at BAS 677; P4 at BAS 11837.)

     In the absence of evidence that add-ons were not reflected
in Owsley's model and that they were material, the jury did not
act unreasonably in crediting Owsley's testimony that

---

of the alleged recalculation.

NationsBanc's misrepresentations caused the plaintiffs' losses
and in rejecting Carron's testimony to the contrary.  The
evidence was sufficient to meet the plaintiffs' burden of proof
for both the federal and state law claims.

### 2.

The defendant also argues that Owsley's model is flawed
because it did not take into account explicitly First Union's
servicing failure after Heilig-Meyers' bankruptcy.  However, as
with the defendant's argument on add-ons, this argument
misconstrues Owsley's model.  His model sought to predict how
the Trust should have operated if the contract default rate was
as NationsBanc represented it to be -- not how the Trust
actually operated, which was captured by the monthly servicer
reports.  Owsley testified that once the model was adjusted to
assume the allegedly higher actual default rate of 20%, it
approximated the actual performance of the Trust very closely
and was a "very good predictor" of how the Trust actually
operated.  (Tr. 2109-10; P938.)

Owsley also testified that the collections predicted by his
adjusted model and actual collections diverged for several
months after Heilig-Meyers' bankruptcy in August 2000.  His
adjusted model predicted a rapid fall-off in collections, which
was the result of the early amortization triggered by Heilig-
Meyers' bankruptcy.  (Tr. 2110-11; P939.)  For a period of

several months, however, actual collections fell off more precipitously than his model predicted.  (Tr. 2112-13, 2216; P939.)  Owsley also noted that actual collections as reported in the monthly servicer reports reflected First Union's withdrawal of $35 million out of the Trust on September 21, 2000.  (Tr. 2218-19.)  Several months after the bankruptcy, once the new servicer stepped in to take over collections, actual collections rebounded.  (Tr. 2111-13; P939.)  Owsley's adjusted model predicted that the Trust would collect $624 million after the August 2000 bankruptcy; in reality, only $578 million was collected, $46 million less than the amount predicted by Owsley's model.  (Tr. 2111-14.)  Owsley testified that these two figures were "pretty close given the amount of noise in this data." (Tr. 2114.)  Owsley also expressed the opinion that the data did not suggest that First Union caused any of the damages suffered by the plaintiffs.  (Tr. 2227.)

The evidence of First Union's work as a servicer does not undercut Owsley's conclusions.  The jury could reasonably have credited Owsley's testimony, finding that the defendant's misrepresentations caused at least $300 to $400 million of the loss to the Trust which would more than have covered and explained the plaintiffs' damages.  Even if the jury thought that First Union's servicing failure also caused some loss to the Trust, that conclusion would not have undercut Owsley's

conclusion as to the causal relation between the defendant's misrepresentations and the plaintiffs' losses.  The jury also could have credited Owsley's testimony that First Union did not cause any appreciable loss to the Trust.  Owsley testified that collections improved after a new servicer stepped in, and the jury could have found the shortfall in collections were eventually recovered by the new servicer.  Importantly, there was no uncontroverted evidence presented by the defendant disproving Owsley's conclusion that whatever First Union's servicing failure, it was not the cause of the plaintiffs' losses.

The evidence cited by the defendant in support of its position falls far short of the kind of undisputed or overwhelming evidence required to overturn a jury verdict.  At trial, the defendant relied heavily on the plaintiffs' complaint in the separate action filed against First Union on December 21, 2001, in which the plaintiffs alleged that First Union's servicing failure caused their losses.  However, allegations in a complaint made prior to any discovery are not dispositive, even if they were made by the plaintiffs.  See PPX Enters., Inc. v. Fredericks, 94 F. Supp. 2d 477, 485 (S.D.N.Y. 2000).  Moreover, the allegations were controverted by Owsley's testimony.

The defendant also points to the testimony of various of

the plaintiffs' witnesses expressing the view that First Union
failed to perform its duties as back-up servicer.  However,
these witnesses testified only that First Union did not perform
its servicing duties after Heilig-Meyers' bankruptcy, not that
its failure to do so caused the plaintiffs' losses.  (See Tr.
656 (AIG Life representative); 1246 (SocGen representative);
1763-64, 1822 (Bank Leumi representatives); Tr. 1928 (Allstate
representative).)  The IFC representative did testify that she
believed that First Union's post-bankruptcy servicing failure
was in part a cause of the decrease in the value of the
securities.  (Tr. 1187.)  However, this is not inconsistent with
the jury's verdict, because the jury could have found that the
defendant's misrepresentations proximately caused all the
plaintiffs' losses even if the servicing issues were responsible
for some depletion in the value of the Trust.  Moreover, her
testimony was a lay opinion, and it was plainly within the
jury's discretion to accord that opinion as much or as little
weight as it saw fit.

### 3.

In the alternative, the defendant argues that the Court
should grant a new trial because the jury's conclusion on loss
causation was against the weight of the evidence.  Even without
viewing the evidence in the light most favorable to the
plaintiffs, however, the Court could not conclude that the jury

reached a seriously erroneous result in finding that the
defendant's misrepresentations caused the plaintiffs' losses.

According to the defendant, the weight of the evidence
against the jury's conclusion on loss causation included not
only the evidence that the plaintiffs themselves believed First
Union to have been the cause of their losses, but also the fact
that three different rating agencies gave the Trust Certificates
their highest possible credit rating.  As explained above,
however, allegations in a complaint made prior to discovery and
the lay opinion of various witnesses that First Union's
servicing failure caused the plaintiffs' losses are not very
probative.

As further evidence weighing against the jury's verdict,
the defendant cites the fact that three rating agencies, namely
Standard and Poor's, Moody's, and Duff & Phelps, gave the
Certificates their highest possible credit ratings, and that
both Moody's and Duff & Phelps knew that Heilig-Meyers
maintained contractual data and took this information into
account at the time they determined the Certificates' ratings.
However, the fact that the rating agencies gave the securities
their highest rating would not support a motion for a new trial.
The jury certainly was not required to find that the high
ratings were justified by a correct determination of the risks
of the installment sales contracts.  The highly rated securities

in fact experienced substantial losses in value.  The jury was
not required to conclude that the rating agencies had correctly
assessed the risks to the securities as a result of the higher
contractual rates of default on the installment sales contracts
that backed the securities than the default rates that were
publicly disclosed.

In any event, it is not clear that either Moody's or Duff &
Phelps actually considered Heilig-Meyers' actual contractual
delinquency and default rates when they rated the Certificates.
Kim Nance-Meier ("Nance-Meier"), the Moody's analyst who rated
the Heilig-Meyers Certificates, did testify that she was certain
that she discussed with NationsBanc and Heilig-Meyers the
difference between what delinquency and default rates would have
been under contractual accounting.  (D551 at 175.)  However, she
also testified that she did not recall having access to the
actual contractual numbers, and did not recall receiving such
contractual statistics in paper, e-mail, or any other physical
form.  (D551 at 55, 177.)  Moreover, the two Moody's reports
authored by Nance-Meier do not suggest that she received Heilig-
Meyers' actual contractual statistics or that she was aware of
the substantial gap between the recency and contractual numbers.
(See D56; D124.)  The reports stated that defaults under recency
accounting were "somewhat understated" as compared to defaults
under contractual accounting, and that "Moody's considered the

possibility that Heilig's reported charge-offs are likely less than they would be under a contractual chargeoff policy." (D56 at AS 658; D124 at SG 505.) Referring to the reported chargeoffs as "somewhat understated" is not consistent with an awareness that contractual defaults were more than twice as large as the reported defaults. Likewise, the use of the words "possibility" and "likely" also suggests that Nance-Meier was not certain what the contractual default rates actually were.

The lead banker at NationsBanc on the Heilig-Meyers securitizations also faxed a copy of contractual statistics to a Duff & Phelps analyst, although the fax, sent on June 23, 1997, was provided to the agency in connection with a planned public offering that was ultimately not pursued. (D136.) There was no evidence that this data ever resurfaced and was considered by Duff & Phelps analysts when they assigned ratings to the 1998-1 and 1998-2 Certificates, and neither of the Duff & Phelps reports on those offerings indicate that they used contractual statistics. (D32; D37.)

In the absence of any evidence that any of the rating agencies actually took Heilig-Meyers' contractual data into account in assessing the credit quality of the installment sales contracts or were aware of the substantial difference between the recency and contractual statistics at the time that they rated the 1998-1 and 1998-2 Certificates, the fact that the

rating agencies assigned high credit ratings to the Certificates
is not so compelling as to suggest that the jury reached a
seriously erroneous or unjust result.  Moreover, even if the
rating agencies had known this information and had given the
Certificates high credit ratings anyway, it is not clear that
the ratings would be such strong evidence as to render the
jury's verdict seriously erroneous or a miscarriage of justice,
particularly in view of the fact that the agencies apparently
seriously misjudged the quality of the assets backing up the
securities.

Finally, the defendant argues that Carron's criticisms of
Owsley's model so weakened Owsley's testimony that the jury's
reliance upon Owsley's testimony was against the weight of the
evidence.  However, even in light of Carron's criticisms,
Owsley's explanation was persuasive.  His assumption that the
contracts in the Trust had an average term at origination of
17.5 months and an average remaining term of 13.5 months was
consistent with the data included in the Offering Memoranda and
the sales memoranda.  On the other hand, Carron's assumption
that the contracts had an average term at origination of 24.2
months and an average remaining term of 17.5 months was not
consistent with that data.  When presented with the 13.5 number
in the sales memorandum, Carron stated that he did not know if
it was accurate and dismissed it as inconsistent with the

offering memoranda.  (Tr. 2383-84.)  Carron's testimony, at the
least, was not so persuasive that it was seriously erroneous or
a miscarriage of justice for the jury to come to a contrary
conclusion.  The defendant's motion for a new trial on the
asserted ground that the jury's finding on loss causation was
against the weight of the evidence is therefore denied.

**B.**

**1.**

The defendant also argues that it is entitled to judgment
as a matter of law, or a new trial, because the plaintiffs did
not "apportion" their losses between the defendant and First
Union.  According to this argument, because the plaintiffs
failed to put on evidence showing how much of their losses
resulted from First Union's servicing failure, the plaintiffs
cannot prove that the defendant's fraud caused their losses.
The purported basis for this theory is the rule in Dura
Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), that a
plaintiff in a securities fraud case may only recover for losses
that were caused by the defendant's misrepresentations or
omissions, and not losses resulting from other causes.

The defendant's argument confuses loss causation with
apportionment.[9]  The defendant asserts that, under Dura, loss

---

[9] A joint tortfeasor may assert the affirmative defense of New York
General Obligations Law § 15-108, which reduces a plaintiff's claim against
non-settling defendants by an amount stipulated by the settlement, by the

apportionment is an element of fraud that the plaintiffs bore

the burden of proving.  Dura did in fact lay out the six basic

elements of securities fraud, but loss apportionment was not one

of them.  Id. at 341-42 (listing six elements as (1) a material

misrepresentation (or omission), (2) scienter, (3) a connection

with the purchase or sale of a security, (4) reliance, (5)

economic loss, and (6) loss causation).  The court's concern in

---

amount of the settlement, or by the amount of the settling defendant's
equitable share of the damages, whichever is greatest.  N.Y. G.O.L. § 15-
108(a).  However, if a defendant does not raise § 15-108 as an affirmative
defense in a timely manner, the defendant waives its right to have a judgment
against it reduced by the amount of a settling defendant's equitable share of
the damages.  Schipani v. McLeod, 541 F.3d 158, 163-64 (2d Cir. 2008) ("[A]
defendant forfeits its right under § 15-108 to an offset in the amount of the
settling codefendant's equitable share if it waits until after summary
judgment on liability to seek an apportionment.").  Here, the defendant did
not raise apportionment as an affirmative defense in its Answer to the
Amended Complaint, nor did it amend its Answer at any time prior to trial to
seek apportionment, nor did it request an instruction asking the jury to
apportion fault among alleged tortfeasors.  At the charge conference held on
November 25, 2009, the Court pointed out that none of the parties had pleaded
apportionment of responsibility nor requested such a charge, and the
defendant did not respond.  The defendant has plainly forfeited its right to
apportionment.
    Because the amount of damages awarded to the plaintiffs would be fully
supported on the basis of the state common law fraud claim alone, it is
academic whether the defendant would be entitled to apportionment under the
federal securities laws even though it never sought apportionment either
before or during trial.
    First Union had originally been a defendant in the lawsuit that charged it
with liability for its alleged servicing failures.  It was also a co-
defendant in this action based on the fact that it, like BAS, was an initial
purchaser of the securities and sold them to various plaintiffs pursuant to
the Offering Memoranda and other communications that were alleged to be false
and misleading.  When First Union settled its liability in this case, the
Court entered a bar order which was consented to by all parties, and which
provided that, if there is a final verdict or judgment in this action, "that
the Court shall reduce that verdict or judgment to the full extent that is
consistent with applicable law, including federal and/or state law verdict or
judgment reduction provisions."  (Order dated January 28, 2005 at 4.)  BAS
understandably did not attempt to prove proportionate fault by First Union
with respect to the allegations in this action.  BAS's position has always
been that there were no misrepresentations or omissions in the Offering
Memoranda nor in its other communications to investors, not that First Union
bore part of the alleged responsibility for any alleged misrepresentations or
omissions.

Dura was not that the plaintiffs had not quantified the amount
of losses resulting from factors other than the fraud, but
rather that the plaintiffs in that case had not even alleged a
causal link between the inflated share price and the losses
suffered from the subsequent stock drop.  See id. at 346-47
(holding that complaint did not adequately plead loss causation
and economic loss where complaint failed "to claim that Dura's
share price fell significantly after the truth became known").
To prove loss causation, Dura held that a plaintiff who relies
on a decrease in stock price as a basis for damages must show
that the drop in stock price was caused by the fraud, and not
other causes, such as changed economic circumstances, changed
investor expectations, or other conditions or events that
account for some or all of the lower price.  Id. at 343.
Nothing in Dura required a plaintiff who proved a loss that was
proximately caused by the defendant's material
misrepresentations or omissions on which it relied to shoulder
some apportionment burden.  Rather, a plaintiff is only required
to show that "all or an ascertainable portion" of its loss was
caused by the defendant's conduct.  Lentell, 396 F.3d at 175.

    Moreover, proving loss causation in connection with the
sale of privately-offered, asset-backed securities such as the
Heilig-Meyers Trust Certificates is a different undertaking from
proving loss causation in a typical stock drop case.  As the

Court of Appeals for the Second Circuit has explained, "in securities cases there is a presumption that shares are purchased for the purpose of investment and their true value to the investor is the price at which they may later be sold." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir. 2007).  This presumption did not apply in Allegheny Energy, which involved a common law fraud claim arising from the sale of a business, rather than from a transaction in publicly-traded securities.

Likewise, that presumption does not apply here, where the plaintiffs do not allege that they suffered losses from selling the Certificates at some reduced price after the fraud was uncovered.  Rather, the plaintiffs allege that they suffered losses when, after the securitization went into early amortization, there was not enough money in the Trust to pay them back.  The plaintiffs purchased the Trust Certificates with the expectation that they would receive a stream of interest payments for the life of the securitization and, at the end of the securitization, the return of their principal.  Therefore, the plaintiffs' loss was not a decrease in market price, but a decrease in the amount of money returned to them over the course of the securitization.

The proof of loss causation required in this case is also different than in stock drop cases because of the cushion

provided by the credit enhancements.  The additional value
provided by the credit enhancements meant that the Trust should
have had more value than was necessary to repay all investors in
full at the end of the securitization.  Therefore, the sum total
of the depletion in the value of Trust from all causes is
necessarily more than the actual losses suffered by holders of
the Certificates.  To prove loss causation in this case, it is
sufficient if the plaintiffs show that the defendant
misrepresented the value of the assets that were to be used to
pay back the plaintiffs and that this shortfall in value was at
least the amount of the plaintiffs' losses.  For purposes of
proving loss causation with respect to the defendant's actions,
it is irrelevant whether other causes also depleted some of the
value of the Trust.  Put another way, it is sufficient if the
plaintiff prove that, if the default rates had been as
represented, there would have been enough money in the Trust to
pay the plaintiffs back in full.  See Lentell, 396 F.3d at 175
(holding that securities fraud plaintiffs must show that they
"would have been spared all or an ascertainable portion of that
loss absent the fraud").

    This is precisely what the plaintiffs proved at trial.  At
trial, Owsley testified that according to his model there was
$300 to $400 million less value in the Trust because the true
default rates were 12.5% higher than had been disclosed, and

that this shortfall was not the result of other factors, such as
First Union's servicing failure.  Loss causation was further
bolstered by Carron's own testimony, in which he asserted that
Owsley's assumptions about contract maturities caused Owsley to
understate the value in the Trust by $275 million, which would
have been enough to repay the plaintiffs in full.  (Tr. 2337.)
Thus, if the jury discounted Carron's opinion and credited
Owsley's assumptions about contract maturities, the jury
reasonably could have found that it was the Trust contracts'
higher default rate that reduced the value in the Trust by at
least $275 million.  To prove loss causation, the plaintiffs did
not also need to show the amount of damages, if any, caused by
First Union.  In any event, there was no evidence of the extent
of First Union's alleged misfeasance nor any reasonable basis to
reduce the damages caused by the defendant simply because First
Union also may have decreased the value of the Trust.

Invoking Federal Rule of Evidence 408, the defendant also
argues that the jury impermissibly used the $30 million
settlement amount with First Union as a proxy for the amount of
damages caused by First Union.  Rule 408, however, prohibits the
admission of a settlement only when offered to prove a
defendant's liability.  Fed. R. Evid. 408(a).  Rule 408 does not
prohibit evidence of settlements when offered for purposes not
otherwise prohibited by the Rule.  Fed. R. Evid. 408(b); see

also <u>Starter Corp. v. Converse, Inc.</u>, 170 F.3d 286, 293 (2d Cir. 1999) ("The trial judge 'has broad discretion as to whether to admit evidence of settlement . . . offered for 'another purpose.''") (quoting <u>Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.</u>, 865 F.2d 506, 511 (2d Cir. 1989)).  Here, evidence of the settlement amounts with First Union was properly offered to reduce the amount of damages awarded to the plaintiffs.  The plaintiffs' alleged damages had to be reduced by the amount of money they recovered from First Union.[10]  <u>See</u> <u>Gerber v. MTC Elec. Techs. Co., Ltd.</u>, 329 F.3d 297, 303-04 (2d Cir. 2003); <u>Singer v. Olympia Brewing Co.</u>, 878 F.2d 596, 600 (2d Cir. 1989). Moreover, the Court also instructed the jury that the settlement could not be considered by the jury as evidence of the defendant's liability.  (Tr. 3231.)  Finally, the Court at least twice invited the parties to propose additional limiting instructions in connection with the First Union settlement, but the defendant did not make any such proposal.  (Tr. 1965, 2269.)

**2.**

In the alternative, the defendant argues that misleading jury instructions necessitate a new trial.  According to the defendant, the Court's charge instructing the jury to subtract the amount of the First Union settlement from the plaintiffs'

---

[10] The settlement amounts with First Union were introduced in evidence to reduce the amount of damages the plaintiffs could recover.  The entire $30 million was deducted from the plaintiffs' losses.  No settlement agreement

total losses effectively told the jury that they could subtract no more than $30 million to account for First Union's role, if any, in causing the plaintiffs' losses.  The plaintiffs respond that the charge was proper and did not give either a misleading impression or an inadequate understanding of the law.

"[A] new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law." Fidelity and Guaranty Ins. Underwriters, Inc. v. Jasam Realty Corp., 540 F.3d 133, 139 (2d Cir. 2008) (quoting BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 696 (2d Cir. 1993)).  "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" United States v. Locascio, 6 F.3d 924, 942 (2d Cir. 1993) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)).  A jury charge must also be viewed in the context of the entire trial.  United States v. Dyer, 922 F.2d 105, 107 (2d Cir. 1990).

On the issue of compensatory damages, the Court correctly instructed the jury:  "If you find that the plaintiff you are considering did sustain damage as a result of the fraud, you must next decide the actual monetary loss sustained as a result of the fraud."  (Tr. 3230 (emphasis added).)  The Court continued:

---

with First Union was ever introduced into evidence.

In considering the issue of each plaintiff's damages, you
are instructed that you should assess the amount you find
to be justified by a preponderance of the evidence as full,
just and reasonable compensation for all of the plaintiffs'
damages <u>caused by the fraud</u>, no more and no less.

In this case, you have heard testimony that the plaintiffs
reached a settlement with First Union.  If you find that
the plaintiff you are considering is entitled to an award
of damages, you must subtract the amount of settlement
between that plaintiff and First Union from that
plaintiff's total losses because the plaintiff is only
entitled to recover its actual losses and any payment by
First Union has reduced those actual losses.

While you have heard testimony that First Union entered
into settlements with the plaintiffs, those settlements
cannot be considered by you as any evidence that the
defendant is liable to any of the plaintiffs.  Parties
enter into settlements for many reasons, and the fact that
First Union entered into settlements is irrelevant to
whether the defendant is liable to any of the plaintiffs.

(Tr. 3231.)

At the charge conference held on November 25, 2008, the

defendant objected to the original charge which did not include

the phrases "as a result of the fraud" and "caused by the fraud"

underlined above.  (Tr. 2843-44.)  With the consent of the

plaintiffs, the Court added this language to the charge.  (Tr.

2843-44.)  The defendant also objected to the last two

paragraphs of the compensatory damages charge, which pertained

to First Union.  (Tr. 2844-49.)  In the defendant's view,

instructing the jury to subtract the $30 million settlement from

the plaintiffs' total losses misled the jury into believing that

the $30 million was the amount of damages caused by First Union.

(Tr. 2848.)

The Court's instruction directing the jury to deduct the amount of the First Union settlement was correct as a matter of law.  Even if the jury had found that First Union had caused no part of the plaintiffs' losses, the jury would have had to deduct the settlement amounts from the plaintiffs' losses to ensure that the plaintiffs did not enjoy a "double recovery." See Gerber, 329 F.3d at 303-04; Singer, 878 F.2d at 600.  The charge clearly instructed the jury that the purpose of the deduction was to prevent a double recovery, explaining that "the plaintiff is only entitled to recover its actual losses and any payment by First Union has reduced those actual losses."  (Tr. 3231.)  Finally, the addition of the language "as a result of the fraud" and "caused by the fraud" provided additional clarity to the instructions.  Taken as a whole, the charge instructed the jury that it could award damages to the plaintiffs only for those damages caused by the defendant's fraud, and that the total amount of damages must be reduced by $30 million because that amount actually reduced the amount of the plaintiffs' losses.  Furthermore, in the context of the entire trial, throughout which the defendant argued vigorously and extensively that First Union was the cause of all of the plaintiffs' losses, the charge was not confusing or misleading.

### C.

The defendant also argues that the general verdict in this

case must be vacated and a new trial ordered because the
plaintiffs submitted legally defective theories of liability to
the jury, and the general verdict does not indicate upon which
theories the jury predicated its finding of liability.
According to the defendant, each of the four ways in which the
plaintiffs alleged that the defendant misrepresented the credit
quality of the Trust contracts constituted a separate theory of
liability.  The plaintiffs assert that this argument is really
an objection to the use of a general verdict instead of special
interrogatories and that the defendant therefore forfeited such
an objection when it failed to ask for special interrogatories
before the jury retired for deliberations.  The plaintiffs also
dispute the defendant's characterization of the four ways in
which the defendant was alleged to have misled investors as
theories of liability and maintain that they were merely
different factual allegations made in support of its single
claim that the defendant misrepresented the credit quality of
the Trust contracts.  Finally, whether the four kinds of
misrepresentations are considered factual allegations or
theories of liability, the plaintiffs argue that there is no
basis to set aside the verdict because none of the allegations
or theories were legally defective or lacking in sufficient
evidence.

      In cases involving multiple claims, one or more of which is

found to be invalid, it is the rule that a general verdict must be reversed and a new trial ordered if the court cannot determine whether the verdict was based upon the invalid theory. Bruneau v. S. Kortright Cent. Sch. Dist., 163 F.3d 749, 759 (2d Cir. 1998); Katara, 835 F.2d at 971.  The general verdict rule has also been held to apply in cases where multiple legal theories of liability were submitted to the jury.  See Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 29-30 (1962); Yates v. United States, 354 U.S. 298, 311-12 (1957); Ne. Tel. Co. v. Am. Tel. and Tel. Co., 651 F.2d 76, 94-95 (2d Cir. 1981); Borger v. Yamaha Int'l Corp., 625 F.2d 390, 398 (2d Cir. 1980).  However, these cases do not apply where there is only a single theory of liability and a single claim.

Here, the plaintiffs pursued a single fraud claim and the single theory that the defendant's statements and omissions misrepresented the credit quality of the Trust contracts.[11]  The four kinds of misrepresentations alleged were not separate legal theories of liability, but were rather separate factual allegations made in support of the plaintiffs' claim.  Cf. Fowler, 2001 WL 83228, at *9 (holding that various incidents of retaliation were allegations in support of single theory of liability and not separate theories of liability).

---

[11] While the plaintiffs pursued their fraud claim under both federal and state law, the alleged material misrepresentations and omissions were the same.

The Court instructed the jury that, for purposes of the federal fraud claim, each plaintiff was required to prove that, in connection with the individual plaintiff's purchase of the Heilig-Meyers Certificates, the defendant made an untrue statement of a material fact, or omitted to state a material fact which made what was said, under the circumstances, misleading. (Tr. 3214-15.) The Court instructed the jury that, for the purposes of the state fraud claim, each plaintiff was required to prove that the defendant made a representation of fact to the plaintiff the jury was considering and that the representation was false. (Tr. 3222.) The Court explained the specific four statements and omissions that the plaintiffs claimed to be false and misleading only because the defendant complained that one of the plaintiffs' attorneys had strayed in his summation from the alleged misrepresentations and omissions specified in the Joint Pre-Trial Order. (Tr. 3122-25.) Prior to that addition, which was made before the Court charged the jury, there was no specification of the individual misrepresentations and omissions in the charge. The Court then added the specifications and also included the defendant's response. (Tr. 3180-83.)

Nevertheless, it would be a concern if the jury in fact based its verdict solely on one factual allegation that either legally did not constitute fraud or was not supported by

sufficient evidence.  See McCord v. Maguire, 873 F.2d 1271, 1274
(9th Cir. 1989) (Kozinski, J.).  However, as the Court of
Appeals for the Ninth Circuit found in McCord, the defendant's
failure to request special interrogatories that would have
indicated upon which factual allegations the verdict rested
precludes the defendant from raising this argument now.  Id.
Where there are multiple factual bases for liability on a single
claim, one or more of which is found to be defective, but where
special interrogatories as to each factual allegation are not
requested, the general verdict must be upheld if the remaining
evidence is sufficient to support it.  Id.  "Any other rule
would unnecessarily jeopardize jury verdicts that are otherwise
fully supported by the record on the mere theoretical
possibility that the jury based its decision on unsupported
specifications."  Id.  Therefore, by failing to request special
interrogatories for each factual allegation made in support of
the plaintiffs' fraud theory, the defendant forfeited its
general verdict argument.

       In any event, even if the general verdict rule applied to
this case, there is no basis for upsetting the general verdict
in this case because none of the allegations or theories were
either legally defective or so lacking in evidence as to warrant
either a new trial or judgment as a matter of law in favor of
the defendant.

The defendant argues that two of the plaintiffs' alleged misrepresentations or omissions, namely the allegation that the defendant failed to disclose adequately the use of recency accounting and the allegation that the defendant failed to disclose the fact that Heilig-Meyers also kept delinquency and default statistics on a contractual basis, were legally flawed because they invited the jury to conclude that the mere use of recency accounting or of two accounting methods was inherently fraudulent.  This argument is without merit.  The plaintiffs never argued that recency accounting itself was fraudulent, or that the use of more than one accounting method was fraudulent. Rather, they argued and presented evidence that the use of recency accounting and the failure to disclose that Heilig-Meyers also kept contractual statistics was, under the circumstances, misleading.  The jury reasonably could have found this to be true:  there was evidence that the contractual method of accounting for delinquencies and defaults was the industry standard and the method used by several other retailers for their installment sales programs, that the contractual rates were more than twice the recency rates, that only the recency numbers were provided to the plaintiffs, and that the defendant never told the plaintiffs that the numbers they received systematically underreported delinquency and default rates compared to the "industry standard" figures that the plaintiffs

might have otherwise expected to receive.  There is therefore no
basis to upset the verdict even if the general verdict rule were
to apply here.

Finally, the defendant challenges the sufficiency of the
evidence supporting the verdict with respect to AIG Global,
Allstate, Travelers, IFC, and SocGen, all of whom received
either the 1998-1 or the 1998-2 Offering Memorandum or
Preliminary Offering Memorandum, but none of whom received any
sales memoranda or other communications containing comparisons
between Heilig-Meyers' delinquency and default rates and those
of other retailers.  As explained above, however, there was
sufficient evidence upon which the jury reasonably could have
found from all of the evidence of what was presented to these
plaintiffs that the defendant's failure to disclose adequately
the use of recency accounting and the fact that Heilig-Meyers
also maintained contractual delinquency and default statistics
was fraudulent.  There is therefore no basis for granting
judgment as a matter of law to the defendant with respect to
these five plaintiffs.

### D.

The defendant also argues that judgment as a matter of law
in its favor should be granted on SocGen's claim against it
because SocGen cannot prove that its reliance on the defendant's
representations caused its losses.  According to the defendant,

-52-

because SocGen had already assumed responsibility for any losses on the Certificates when it purchased them in August 1998, any reliance on the defendant's representations in November 1998 could not have been the legal cause of SocGen's losses.

As the plaintiffs point out in their opposing papers, however, this argument was not raised in the defendant's Rule 50(a) motion.  A post-trial motion for judgment as a matter of law "is limited to those grounds that were 'specifically raised in the prior motion for [JMOL].'"  McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir. 1997).  Moreover, the initial motion for judgment as a matter of law "must at least identify the specific element that the defendant contends is insufficiently supported."  Tolbert v. Queens Coll., 242 F.3d 58, 76 (2d Cir. 2001) (quoting Galdieri-Ambrosini v. Nat'l Realty and Dev. Corp., 136 F.3d 276, 286 (2d Cir. 1998)); see also Lambert v. Genesee Hosp., 10 F.3d 46, 54 (2d Cir. 1993) ("[T]he specificity requirement is obligatory . . . .").  The rationale is that the motion must be sufficient to advise the opposing party of the precise issue on which more evidence is needed before the issue is submitted to the jury.  Tolbert, 242 F.3d at 76-77.  "A motion that identifies one element of a claim is insufficient to permit the district court to grant JMOL for lack of proof of some other, unspecified, element . . . ."  Tolbert, 242 F.3d at 77.

In its Rule 50(a) motion, the defendant made two arguments targeted at SocGen:  first, that the November 1998 transaction was a transfer and not a sale of securities; and second, that there was no evidence that the defendant made any representations to Certain Funding or had reason to believe that any representations made to SocGen in August 1998 would be relied upon by Certain Funding in November 1998.  (Tr. 2283-86, 2298.)  Neither of these arguments addresses loss causation.  Although the defendant made several arguments with respect to why SocGen's claim against the defendant failed as a matter of law, those arguments focused on elements of fraud other than loss causation.  Because the defendant did not preserve a loss causation argument with respect to SocGen, the defendant's motion for judgment as a matter of law with respect to SocGen's claim is therefore denied.

Even if the defendant's loss causation argument with respect to SocGen had been preserved, however, it would nonetheless fail.  The defendant and the plaintiffs stipulated that the November 1998 transaction was a sale.  (Tr. 2284.)  In this transaction, SocGen was the de facto purchaser, but it is also true that it already owned the Certificates at that time.  The defendant argues that the fact that SocGen was both the seller and the buyer precludes it from recovering because failure-to-sell claims are not actionable under federal law.

See <u>United States v. Reifler</u>, 446 F.3d 65, 136 (2d Cir. 2006) (citing <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 737-38 (1975)).  However, SocGen's claim is not a failure-to-sell claim.

In a concurring opinion, Justice O'Connor explained that the Supreme Court "adopted the purchaser/seller standing limitation in § 10(b) cases as a prudential means of avoiding the problems of proof when no security was traded . . . ." <u>Holmes v. Sec. Investor Protection Corp.</u>, 503 U.S. 258, 285 (1992) (O'Connor, J., concurring in part).  Because there was a sale in this case, the proof concerns underlying the limitation on failure-to-sell claims do not apply.  SocGen made a discrete decision to sell the Certificates to Certain Funding rather than to resell them into the market, and SocGen was therefore not merely an investor who simply held its stock until it became worthless.  <u>Cf.</u> <u>Reifler</u>, 446 F.3d at 136.  When it sold the Certificates to Certain Funding, SocGen bore the risk of default on the Certificates.  SocGen provided a letter of credit to Certain Funding so that if Certain Funding suffered a loss due to the default of an asset, such as the Certificates, SocGen would cover the loss.  (Tr. 1223-28; P715.)  SocGen thus suffered harm from the November 1998 sales to Certain Funding because in the absence of that transaction, it would not have incurred the loss it bore for the default on the Certificates.

As a de facto purchaser, SocGen alleged that it assumed the risk of default on the Certificates in reliance on the defendant's misrepresentations, and this allegation was supported by clear and convincing evidence.  Because the jury reasonably concluded that the defendant's misrepresentations caused SocGen's losses, the defendant's motion for judgment as a matter of law with respect to SocGen is denied.

**E.**

The defendant also moves for judgment as a matter of law on the ground that the plaintiffs' claims under Section 10(b) and Rule 10b-5 are time barred.  As with its SocGen argument, because the defendant did not raise a statute of limitations argument in its Rule 50(a) motion, it may not raise such an argument now on its Rule 50(b) motion.  See McCardle, 131 F.3d at 51.  In any event, however, the defendant's argument also fails.

"Litigation instituted pursuant to § 10(b) and Rule 10b-5 . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).  "The one-year limitations period applicable to discovery of the violation begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise

of reasonable diligence, would have led to actual knowledge."
LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d
148, 154 (2d Cir. 2003) (internal quotations, citation and
alteration omitted).  A duty of inquiry arises "when the
circumstances would suggest to an investor of ordinary
intelligence the probability that [it] has been defrauded."
Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003)
(quoting Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir.
1993)).  "[T]he question of whether a plaintiff exercised
reasonable diligence is usually a question of fact for the jury
to decide."  In re Integrated Res. Real Estate, Ltd. P'ships
Sec. Litig., 815 F. Supp. 620, 638 (S.D.N.Y. 1993); see also
Robertson v. Seidman & Seidman, 609 F.2d 583, 591 (2d Cir. 1979)
("Issues of due diligence and constructive knowledge depend on
inferences drawn from the facts of each particular case . . .
.").

     In this case, the statute of limitations defense was
properly presented to the jury, and the jury was instructed that
the one-year statute of limitations ran from when the plaintiffs
first obtained knowledge of the fraud, or could with the
exercise of reasonable diligence have discovered the fraud.
(Tr. 3228-29.)  The defendant does not quarrel with the
instruction.  Because of a tolling agreement, although the
action was commenced on December 13, 2001, the jury was told to

consider August 16, 2001 as the relevant date for determining

whether the action was timely commenced.  (Tr. 3229.)

The defendant asserts that the plaintiffs were on notice of

their claims by September 1998 at the latest, rendering their

federal claim untimely.  On September 15, 1998, Duff & Phelps

published a report which stated that Heilig-Meyers used recency

accounting as well as other accounting methods to track its

receivables.  (D37.)  The report stated:  "The Trust's

delinquencies will be reported on a recency basis wherein a

contract is considered delinquent based upon the number of days

elapsed since the date of a last full payment.  If at any time a

full payment is made, the obligor is considered current on a

recency basis."  (D37 at AIG 1045-46.)  The report continued:

> However, each store also monitors accounts via a four-month
> aging system.  This system tracks contracts based on the
> number of full payments missed in the most recent four
> payment cycles.  Accounts current on a recency basis, but
> owing three payments on a contractual basis would be
> reported as: 0:0:0:1, while accounts three-months
> delinquent on both a recency and contractual basis would be
> reported as 1:0:0:0.

(D37 at AIG 1046.)  According to the defendant, this information

put the plaintiffs on notice that the defendant had defrauded

them.  In response, the plaintiffs argue that none of the

statements in the Duff & Phelps report would have alerted an

investor of ordinary intelligence to the probability of fraud

and that the report therefore did not place them on inquiry

notice of the fraud.

Securities fraud plaintiffs, particularly sophisticated investors like the plaintiffs in this case, are "'charged with knowledge of publicly available news articles and analysts' reports' to the extent that they constitute storm warnings sufficient to trigger inquiry notice." Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274, 298 (S.D.N.Y. 2004) (citing Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc., 821 F. Supp. 212, 222 (S.D.N.Y. 1993)).   However, to the extent that the Duff & Phelps report was publicly available, it was insufficient to put the plaintiff on inquiry notice of the fraud.   Although the report did advert to the use of recency accounting and to a second form of reporting called "four-month aging," it did not indicate that recency accounting substantially understated delinquency and default rates as compared to contractual accounting, nor that Heilig-Meyers also maintained a contractual set of delinquency and default statistics which showed a much higher level of defaults than was publicly reported.   It was properly for the jury to determine in view of all the evidence whether the single report placed the plaintiffs on sufficient notice of the probability of fraud. The jury could reasonably have determined that it did not. Therefore, even if the defendant's statute of limitations argument were not forfeited by its failure to raise the argument

in its Rule 50(a) motion, it nonetheless would not support
judgment as a matter of law in the defendant's favor.

**F.**

In a footnote in its opening memorandum, the defendant
asserts that it is entitled to a new trial on the ground that
the jury's finding of scienter was against the weight of the
evidence.  The defendant appears to abandon this argument by
failing to defend the argument in its reply memorandum.  Even if
the argument were not abandoned, however, it is without merit.
There was clear and convincing evidence at trial from which the
jury could have concluded that the defendant acted with
scienter.

The jury was presented with evidence that the lead banker
at NationsBanc on the Heilig-Meyers securitizations knew that
Heilig-Meyers' contractual delinquency and default rates were
substantially and systematically higher than its recency rates
(Tr. 1487-88; P77); that some of the retailers to which Heilig-
Meyers was compared in the sales memoranda and in investor
conference calls used the contractual method to account for
their delinquency and default rates (Tr. 1520-22; P9); and that
Heilig-Meyers' judgmental override policy resulted in
understated historical loss numbers (P7).  Other responsible
officials at NationsBanc were aware of similar issues.  (Tr.
238-41, 267-68, 286-92, 298-304, 357, 378, 504, 516; P7; P10;

P17; P50.)  The evidence also showed that despite possessing
that knowledge, the lead banker actively participated in the
preparation of the offering and sales memoranda for both
offerings, investor conference call scripts, and other materials
that did not disclose to investors those material facts.  (Tr.
1489-93, 1498-1507, 1515-18, 1529-30; P5; P116; P802.)  The jury
also heard the banker testify that he discouraged ratings agency
analysts from describing Heilig-Meyers' accounting methods and
from using the word "recency" in order to conform such publicly
available documents to the Offering Memoranda, which also did
not use the word "recency."  (Tr. 1589-91; P927; P928.)

    In light of this evidence, the jury did not reach a
seriously erroneous or an unjust result in finding that the
defendant acted with scienter, and the defendant has not cited
in its memoranda any countervailing evidence that would weigh
against this finding.  The defendant's motion for a new trial
based upon the plaintiffs' alleged failure to prove scienter is
therefore denied.

**CONCLUSION**

    This case was diligently and professionally tried for seven
weeks.  Ultimately, the jury concluded that the plaintiffs had
proven their claims.  That conclusion was neither wrong as a
matter of law nor does it warrant a new trial.

    The Court has considered all of the arguments of the

parties.  To the extent not specifically addressed above, they
are either moot or without merit.  For the reasons explained
above, the defendant's motions for judgment as a matter of law
pursuant to Rule 50(b) or for a new trial pursuant to Rule 59
are **denied**.  The Clerk is directed to close Docket No. 180.

SO ORDERED.

Dated:  New York, New York
        May 14, 2009

                                        John G. Koeltl
                                United States District Judge